STATE of Wisconsin, Plaintiff-Respondent,

v.

James E. MULTALER, Defendant-Appellant.†

Court of Appeals

*No. 00–1846–CR. Submitted on briefs April 4, 2001.—Decided June 12, 2001.*

## 2001 WI App 149

(Also reported in 632 N.W.2d 89.)

†Petition to review granted.

753

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey W. Jensen* of *Law Offices of Jeffrey W. Jensen*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Sandra L. Nowack*, assistant attorney general.

Before Fine, Schudson and Curley, JJ.

¶ 1. SCHUDSON, J. James E. Multaler appeals from the judgment of conviction for twenty-eight counts of possession of child pornography, in violation of WIS. STAT. § 948.12 (1997–98),[1] following his "*Alford* no contest" pleas,[2] *see North Carolina v. Alford*, 400 U.S. 25 (1970), and from the order denying his motion for postconviction relief. He argues that: (1) the application for a search warrant of his property failed to establish probable cause that evidence related to

---

[1] WISCONSIN STAT. § 948.12 (1997–98) provided:

> **Possession of child pornography.** Whoever possesses any undeveloped film, photographic negative, photograph, motion picture, videotape or other pictorial reproduction or audio recording of a child engaged in sexually explicit conduct under all of the following circumstances is guilty of a Class E felony:
>
> **(1)** The person knows that he or she possesses the material.
>
> **(2)** The person knows the character and content of the sexually explicit conduct shown in the material.
>
> **(3)** The person knows or reasonably should know that the child engaged in sexually explicit conduct has not attained the age of 18 years.

[2] In this case, Multaler stated each of his twenty-eight pleas as "*Alford* no contest." With an *Alford* plea, a defendant, while not admitting guilt, accepts that the evidence is sufficient for conviction and authorizes the court to proceed as it would following a guilty plea. *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970).

four apparent murders, for which he was a suspect, was then located there; (2) the twenty-eight counts of possession of child pornography were multiplicitous; and (3) his sentence, the maximum consecutive, totaling fifty-six years, was unduly harsh. We affirm.

## I. BACKGROUND

¶ 2. The unsolved apparent murders of four females, whose bodies were found in Milwaukee and Racine counties in 1974 and 1975, and the apprehension of Multaler for the abduction of another female in 1975, provide the background leading to the search warrant at issue in this case.

¶ 3. According to the affidavit of Racine Investigator John C. Hanrahan, filed on May 18, 1998, in support of the application for a search warrant for Multaler's home "and any buildings, garages or outbuildings and vehicles on the property," four Milwaukee females between the ages of fifteen and twenty-one disappeared from January 1974 through May 1975.

¶ 4. C.F.'s body was found about five hours after her disappearance. The cause of death was "strangulation, possibly ligature strangulation."

¶ 5. S.W.'s body was found in a river about one and one-half days after her disappearance.[3] Her sweater had been displaced, revealing her breasts. She was missing her pendant necklace and one of her sandals. The cause of death was ligature strangulation.

¶ 6. W.B.'s body was found in a cornfield about six weeks after her disappearance. Her shirt had been displaced, revealing her breasts. Her Mickey Mouse watch and a bracelet were missing. Due to "mummifi-

---

[3] S.W.'s purse was found along a railroad right-of-way about seven weeks after her disappearance.

cation" of her body, the cause of death was not determined.

¶ 7. S.M.'s body was found in a ditch in Racine County five days after her disappearance.[4] Semen was in her vagina. Many of her personal items—including her eyeglasses, an earring, a pendant necklace, a hair brush, a bottle of perfume, and several forms of identification—were never recovered. A ligature mark, possibly caused by a handcuff, was on her right wrist. Due to the decomposition of her body, however, the cause of death was not determined.

¶ 8. In June 1975, D.W. was driving on a highway near the Milwaukee-Racine county line when she heard an amplified voice, from a car behind her, claiming to be a state police officer and ordering her to pull over. When she pulled over, she was confronted by Multaler who handcuffed her and took her into his car, at gunpoint. Fortunately, however, D.W. was able to escape and contact police, who subsequently arrested Multaler for kidnapping her.

¶ 9. After the arrest, a copy of a newspaper article about the incident was sent to Milwaukee County District Attorney E. Michael Mc Cann with writing at the top stating: "This man is the South Side Killer (7 Mile Rd.)[.] He has raped 36 girls." A handwriting expert determined that the writing was Multaler's. After Multaler's arrest, the succession of unsolved disappearances and strangulations stopped. Multaler thus became a suspect in the four unsolved deaths.

¶ 10. According to Investigator Hanrahan's affidavit supporting the search warrant application, the following facts were revealed during the 1975 investigation of Multaler:

---

[4] S.M.'s purse had been found the previous day in Milwaukee, under a railroad overpass.

(1) One of Multaler's girlfriends stated that "before every sexual act, [he] would place his fingers on her neck and apply pressure to her jugular veins[,] . . . rendering her unconscious." When asked whether she had ever seen Multaler "use or possess a 'rubber carriage tie-down'/bung[e]e cord," she said that she had and described one with one of its hooks "pulled out and bent into the form of the letter 'L.' "[5] She also stated that Multaler "had kept an album containing pictures of females and newspaper articles about missing and murdered females," and she identified an article about the discovery of S.W.'s body as one that she possibly had seen in the album. Additional information obtained from this girlfriend linked Multaler to three other mysterious deaths or unsolved murders.

(2) Another of Multaler's girlfriends stated that "during sexual intercourse with [him], it was his habit to choke her," sometimes "to the point of where she lost consciousness."

(3) The woman Multaler subsequently married stated that "on several occasions during sexual intercourse Multaler placed both his hands around her throat and choked her."

¶ 11. In January 1976, Multaler was convicted of D.W.'s false imprisonment as well as three other crimes related to the offense: operating a vehicle without the owner's consent, endangering safety by conduct regardless of life, and carrying a concealed weapon.

---

[5] Her description matched a bungee cord that had been examined at the Wisconsin State Crime Laboratory; hair tangled in the bungee cord was consistent with that of S.W., whose purse had been found near it.

¶ 12. According to a February 1976 social services departmental report, Multaler admitted being with W.B. on the day she disappeared. He provided specific information about her footwear, thus correcting information that had appeared in the missing-person report. He said that although he could not remember doing so, he felt that he had killed her, explaining: "If she is dead I must have killed her. I had to kill her, I don't recall."

¶ 13. In March 1976, Multaler was committed to the department of health and social services for a presentence examination pursuant to WIS. STAT. § 975.02 (1973).[6] During that commitment, he admitted that he had "always liked strangling—playacting—with every girl [he had] known" and that "if the girl was conscious he could not get an erection unless a struggle were involved." He said that he had been "engaging in rapes for the last two years be[ ]cause he 'couldn't get satisfaction' out of normal relationships with women." One mental health professional diagnosed Multaler as having a "Severe Antisocial Personality" and "Moderate Unspecified Sexual Deviation," and another stated, among other things, that Multaler "has been consistently viewed as a dangerous, unpredictable individual" whose "sexual habits are colored by a need to dominate and hurt sexual partners."

---

[6] WISCONSIN STAT. § 975.02 (1973) provided:

**Discretionary commitment.** If a person is convicted of any sex crime other than those specified, the court may commit him to the department [of health and social services] for such a presentence examination. . . . "Sex crime" as used in this section includes any crime except homicide or attempted homicide if the court finds that the defendant was probably directly motivated by a desire for sexual excitement in the commission of the crime . . . .

¶ 14. In May 1976, Multaler was committed to the department of health and social services for specialized sexual-deviancy treatment pursuant to WIS. STAT. § 975.06 (1973). In 1978, he sent a request to a Milwaukee television station for copies of newspaper articles concerning the four unsolved deaths. In 1982, the circuit court sentenced Multaler to prison for a total of thirteen years, with credit for time served in confinement in a variety of facilities since the 1975 arrest. Following his imprisonment for the crimes relating to D.W., he served three years in federal prison, beginning in 1983.

¶ 15. In 1988, Multaler's thirteen-year-old daughter stated that, for years, Multaler had choked and sexually assaulted her. As of May 1998, police detectives still were investigating the unsolved deaths of the four females, and Multaler remained under suspicion.

¶ 16. In his affidavit supporting the search warrant application, Hanrahan also described his research and specialized training related to serial killers. He then explained that "based on his training and research," serial homicide offenders often:

> take clothing, jewelry and other property such as photo's [sic], identification and other personal items from their victims. These items are used by the offender to relive and recapture the moment of the homicide event, where often[ ]times the offender feels that he now possesses the victim. These items are used by the offender to fuel his fantasies and confirm the victim possession until the fantasy is no longer enough, such that he has to go out and find another victim.
>
> . . . keep newspaper clippings about the death and subsequent police investigation of his [sic] vic-

tims. These items also⁹help the offender in his fantasies, and act as proof and reminders of his act.

. . . keep written documentation such as diaries for the reasons detailed above.

. . . take photographs, as well as audio and video recordings of their victims.

. . . keep these items . . . even under intense police investigation. The need to keep these items as reminders and fantasy tools outweighs the risk of being caught by possessing such incriminating evidence.

Hanrahan then stated that serial killers "often[ ]times interject themselves into the investigation and[/]or taunt investigators" such as Multaler had done in writing the note to District Attorney Mc Cann. He further provided information linking Multaler to the areas where the four bodies had been found. Based on all this information, Hanrahan concluded that Multaler had killed the four females.

¶ 17. Finally, Hanrahan's affidavit stated that for over twenty years, and continuing to the time of the search warrant application, Multaler had resided at the address targeted for the search, and that "it is reasonable and probable that Multaler's residence contains evidence of these homicides." On May 18, 1998, based on Hanrahan's application, Racine County Circuit Court Judge Stephen Simanek issued the search warrant.

¶ 18. Executing the search warrant on May 19, 1998, the police did not discover any of the evidence they had sought regarding the four deaths. They did, however, find numerous videotapes, computer equipment, and computer diskettes—one diskette was labeled "Child Pornography" and another was labeled " Child Pornography II." On May 26, 1998, police

obtained a warrant, from Milwaukee County Circuit Court Commissioner Audrey Y. Brooks, to copy and search the contents of the diskettes.[7] The search revealed seventy-nine photographic images of children engaging in sexually explicit conduct.

¶ 19. The State charged Multaler with seventy-nine counts of possession of child pornography, each count corresponding to one of the images. According to the criminal complaint, Multaler admitted that he had downloaded these images "for his own use" and "for the possibility of resale or for the possibility of use for child and adult pornography which he planned on producing."[8]

¶ 20. In a series of motions, Multaler sought suppression of the diskettes, arguing that Hanrahan's affidavit in support of the application for the first search warrant did not establish probable cause "to believe that the items specifically sought[,] which were last seen in 1974 and 1975 on the victims prior to their death [sic][,] would be in the home . . . in May of 1998."

---

[7] Additionally, on May 29, 1998, police requested a warrant to "copy, review, and analyze all computer and computer-related items recovered pursuant to the search warrant signed May 18, 1998"; Milwaukee County Circuit Court Commissioner Dennis R. Cimpl issued the warrant.

[8] According to the testimony of City of Milwaukee Police Detective James DeValkenaere, offered at Multaler's sentencing hearing, Multaler stated

> that he wanted to make his own child pornography video involving his own sexual fetish, which involves unconscious girls who are choked or drugged for sexual acts while unconscious, so his reasons for obtaining the child porn was [sic] for research so that he could direct, produce, and film his own child pornography focused toward . . . his own sexual preference, choked and unconscious girls and women, and also for sale.

He also sought a *Franks / Mann* hearing,[9] alleging that Investigator Hanrahan provided misleading information by stating that Multaler "has resided at the same residence with his wife and daughter for over twenty years." Multaler argued that Hanrahan knew or should have known that he could not have lived at the same residence for "over twenty years" because he was in and out of prison and Central State Hospital during that time. The circuit court denied his motions for suppression and for a hearing.[10]

---

[9] In *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), the Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*See also State v. Mann*, 123 Wis. 2d 375, 384, 367 N.W.2d 209 (1985) (quoting *Franks*).

[10] In an additional series of motions, Multaler again sought a *Franks / Mann* hearing, contending that Investigator Hanrahan, in stating that serial killers "often" take personal items from their victims, misrepresented one of the experts on whom he had relied. In the words of Multaler's motion, that expert's book stated that "studies show that in 32 of 118 murders only 27% of the offenders kept trophies and/or mementos." The book actually stated: "Many murderers' postcrime behavior involves the keeping of various items, generally associated with the victim, as 'souvenirs' of the murder (this was the case in 32 of 118

¶ 21. Multaler then moved to dismiss the charges or, in the alternative, to consolidate them, arguing that the seventy-nine counts were multiplicitous. He contended that *each of the two diskettes* could constitute a single count or, at most, that *each of the 35 printed pages* of images, rather than each image on each page, could constitute a single count. (He also contended that seven additional images should be eliminated from the counts charged "on the grounds that it is not obvious from looking at them that they constitute people under 18 engaging in sexual activity.") The circuit court never decided Multaler's multiplicity motion, however, because Multaler entered into an agreement by which he pled to twenty-eight counts.[11]

murders, or 27 percent)." ROBERT K. RESSLER ET AL., SEXUAL HOMI CIDE: PATTERNS AND MOTIVES 63 (Lexington Books 1988). Because of the plea agreement resolving the case, the circuit court never ruled on this second request for a *Franks / Mann* hearing.

[11] In its brief to this court, the State explains that "the twenty-eight charges included only images to which Multaler had not previously objected, and resulted in no more than one charge per page of printed child pornography." Multaler does not dispute this characterization.

The plea hearing record reveals that after Multaler entered his pleas, the court announced its intention to use the criminal complaint as a factual basis. The prosecutor then noted that attached to the criminal complaint were "the down[ ]loaded computer images with the supporting document for each and every one of the[ ] counts [to which Multaler had pled]." The ensuing colloquy between the prosecutor and defense counsel revealed that Multaler had declined the opportunity to review "the photographic, down[ ]loaded, computer images for each of the[ ] counts," and that he had relied on defense counsel's "descriptions of the material that was contained in the Information" in order to "understand[ ] that they depicted children who [were] under the age of consent."

## II. DISCUSSION

### A. Search Warrant[12]

¶ 22. Multaler first argues that the affidavit in support of the search warrant application failed to establish probable cause to believe that evidence of the four apparent murders was in his home because (1) it did not establish that he was "the person who strangled the four victims," and (2) even if it did, the affidavit still did not establish that he was "likely to have maintained possession of any such items for nearly twenty-four years." We disagree.

¶ 23. Reiterating the standards for issuance of a search warrant, the supreme court has explained:

> A search warrant may only issue on the basis of a finding of probable cause by a "neutral and detached magistrate." Whether probable cause exists is determined by analyzing the "totality of the circumstances."
>
>> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.
>
> This court has stated that the warrant-issuing judge must be apprised of "sufficient facts to excite

---

[12] On appeal, Multaler challenges only the first search warrant. And in challenging that warrant he does not renew the specific arguments he raised in his two requests for *Franks/Mann* hearings.

an honest belief in a reasonable mind that the objects sought are linked with the commission of a crime, and that the objects sought will be found in the place to be searched." "The quantum of evidence necessary to support a finding of probable cause for a search warrant is less than that required for a conviction or for bindover following a preliminary examination." "Probable cause [is] not susceptible of 'stringently mechanical definitions.' What is required is more than a possibility, but not a probability, that the conclusion is more likely than not. This court has always stressed the reasonableness factor."

*State v. DeSmidt*, 155 Wis. 2d 119, 131–32, 454 N.W.2d 780 (1990) (citations omitted; first brackets added).

¶ 24. Additionally, the supreme court has set the standards governing our review of a challenge to the sufficiency of an application for a search warrant:

In reviewing whether probable cause existed for the issuance of a search warrant, we are confined to the record that was before the warrant-issuing judge. The person challenging the warrant bears the burden of demonstrating that the evidence before the warrant-issuing judge was clearly insufficient. Review of the warrant-issuing judge's finding of probable cause is not *de novo*. Rather, great deference should be given to the warrant-issuing judge's determination.

'A grudging or negative attitude by reviewing courts toward warrants[] . . . is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than oth-

erwise may be the case . . . A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that the probable cause existed." "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded warrants."

*Id.* at 132–33 (citations omitted).

¶ 25. Multaler has not established that the information in Investigator Hanrahan's affidavit was "clearly insufficient" to support the issuance of the search warrant. Indeed, we conclude that the information, although certainly not typical of that supporting most search warrant applications, provided solid support for the search of Multaler's property.

¶ 26. First, the facts in Investigator Hanrahan's affidavit easily defeat Multaler's challenge to the circuit court's probable cause determination that he had killed the four females. Without revisiting all the details here, and having summarized the most salient portions of the affidavit in the factual background of this opinion, we merely observe that the affidavit carefully and comprehensively connected Multaler to the apparent murders. It related evidence, both direct and circumstantial, that provided the circuit court with a substantial basis for finding probable cause to believe that Multaler had committed the apparent murders.[13]

---

[13] Further, we note, Multaler's legal premise is flawed. He argues, "Obviously, if such probable cause existed the [S]tate

¶ 27. Second, Investigator Hanrahan's research, expertise, and reasonable inferences, carefully conveyed by his affidavit, provide substantial support for the circuit court's probable cause determination that, notwithstanding the passage of many years between the deaths and the search warrant, evidence of the apparent murders remained at Multaler's residence.

■■■■

¶ 28. As this court has explained, when evaluating whether information is so stale that it cannot form the basis for a search warrant, timeliness is not determined by counting the time "between the occurrence of the facts relied upon and the issuance of the warrant."

---

would have arrested him and charged him long ago." Similarly, the dissent makes the mistake of asserting that "[t]he fact that Multaler was never charged with any of the murders" was among the factors that "bode[ ] against a probable cause determination twenty-three years later." Dissent at ¶ 53. As we just observed, however, " '[t]he quantum of evidence necessary to support a finding of probable cause for a search warrant is less than that required for a conviction or for bindover following a preliminary examination.' " *State v. DeSmidt*, 155 Wis. 2d 119, 132, 454 N.W.2d 780 (1990).

In a related way, one of the dissent's legal premises is flawed. The dissent states that "hindsight supports [its] conclusion that no probable cause existed here" in part because "[n]o evidence of the murders was found at Multaler's residence." Dissent at ¶ 54 n.1. Sometimes, however, searches do not succeed in discovering the evidence for which the search warrants authorized the searches. Needless to say, no legal authority has ever suggested that such *lack of search success* can somehow be subsequently superimposed on the warrant application affidavit to establish the *lack of probable cause* (any more than the *success* of a search can be retrospectively superimposed on an affidavit to supply the *probable cause* that had been lacking).

*State v. Ehnert*, 160 Wis. 2d 464, 469, 466 N.W.2d 237 ( Ct. App. 1991).

> Instead, timeliness depends upon *the nature of the underlying circumstances and concepts*. When the activity is of a protracted and continuous nature, the passage of time diminishes in significance. Factors like *the nature of the criminal activity* under investigation and *the nature of what is being sought* have a bearing on where the line between stale and fresh information should be drawn in a particular case.

*Id.* at 469–70 (citations omitted; emphases added). Moreover, "if old information in a warrant affidavit 'contributes to an inference that probable cause exists at the time of the application [for a warrant], its age is no taint.' " *State v. Moley*, 171 Wis. 2d 207, 210, 490 N.W.2d 764 (Ct. App. 1992).

¶ 29. Under the unique circumstances of this case, all the "old information"—including facts regarding the 1974–75 deaths, the 1975 abduction, Multaler's sexual history and psychological profile, and his disclosures—contributed to the logical inferences supporting probable cause for the search warrant. Tethered to Investigator Hanrahan's research and expertise, the "old information" was not stale; it had been revived by his fresh analysis of "the nature of the criminal activity" and the nature of the evidence that, Hanrahan reasonably believed, remained at Multaler's residence.[14] *See Ehnert*, 160 Wis. 2d at 469–70. As the State argues:

---

[14] The dissent, accepting Multaler's argument, asserts that Investigator Hanrahan "had to have known that Multaler spent approximately ten of the last twenty-odd years in prison" and, therefore, that his affidavit incorrectly informed Judge

[O]f critical importance[ ] is the nature of the acts and evidence under consideration. Not because the phrase "serial killer" creates shock and alarm, but because rationally, the unique nature of this pattern of crimes makes it more likely that evidence of the crimes will be retained. The affidavit establishes that serial killers are uniquely likely to have a strong psychological compulsion to keep evidence of their crimes, even when they know they are under investigation. In fact, the affidavit establishes that serial killers may unreasonably flirt with the risk of being detected, as part of the nature of their unique criminal mentality.

¶ 30. We agree. Based on all the information in the affidavit, and based on the logical links—both connecting the apparent murders to Multaler and connecting Multaler's conduct to that of serial killers—Judge Simanek reached "a practical, common-sense decision" that, "given all the circumstances set forth in the affidavit," there was, at the very least, "a fair probability" that evidence of the apparent murders would be found at Multaler's residence. *See DeSmidt,*

---

Simanek that Multaler had lived at his residence for over twenty years. Dissent at ¶ 54. We disagree. Investigator Hanrahan's affidavit did nothing to conceal or misrepresent Multaler's incarceration. Indeed, the affidavit specified that "after being convicted of kidnaping [D.W.], Multaler was sent to Central State Hospital." (Central State Hospital, at the time, was the state institution for those committed under the sexual-deviancy treatment program.) Judge Simanek no doubt understood that an inmate or committed patient may maintain a "residence" outside the institution walls, where evidence of a crime may remain.

155 Wis. 2d at 131(quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).[15]

## B. Multiplicity

¶ 31. Multaler next argues that the multiple counts for possession of child pornography were multiplicitous and, therefore, that his conviction for twenty-eight counts violates his double jeopardy rights. Specifically, he contends:

> It was not the legislature's intent in creating [WIS. STAT. § ] 948.12 . . . that the allowable unit of prosecution be for each image possessed; rather, like other contraband statutes, in order to charge a separate count there must be a significant difference in time or a significant difference in the nature of the conduct. Thus, since Multaler was found in possession of diskettes, without any significant difference in time or in the nature of the conduct, the allowable unit of prosecution is [two].[16]

---

[15] We share the dissent's concern that search warrants not issue based on stale information. We strongly disagree, however, with the dissent's assertion that under our analysis "a search warrant can easily be issued or reissued *whenever another law enforcement officer gives the stale information a 'fresh analysis.'* " Dissent at ¶ 52 (emphasis added). As we have explained, this case presents "unique circumstances," and Investigator Hanrahan was not what the dissent has termed, just "another law enforcement officer." Much of the information on which he relied was old, but age had not diminished its accuracy or value. And the "fresh analysis" was more than just a new view; it was an analysis based on specialized expertise, specifically connected to a sound and substantial theory, establishing probable cause.

[16] As we observed earlier, Multaler's position in the trial court alternated between several different ways of determining the proper number of counts. His apparent uncertainty contin-

(Footnote added.) Again, we disagree.

¶ 32. The double jeopardy clauses of our federal and state constitutions protect against multiple punishments for the same offense. *State v. Derango*, 2000 WI 89, ¶ 26, 236 Wis. 2d 721, 613 N.W.2d 833. In *Derango*, the supreme court recently reiterated the standards that guide this court's review of multiplicity challenges. As relevant to Multaler's theory, the supreme court explained that one of the two situations in which multiplicity challenges usually arise is

> when a single course of conduct is charged in multiple counts of the same statutory offense (the "continuous offense" cases) . . . .
>
> Multiplicity (and therefore double jeopardy) is implicated only to the extent of preventing a court from imposing a greater penalty than the legislature intended. In other words, because double jeopardy protection prohibits double punishment for the "same offense," the focus of the inquiry is whether the "same offense" is actually being punished twice, or whether the legislature indeed intended to establish separate offenses subjecting an offender to separate, although cumulative, punishments for the same act. . . .
>
> We have established a two-part test for analyzing multiplicity challenges. The first part consists of an analysis under *Blockburger v. United States*, 284 U.S. 299, 304 . . . (1932), to determine whether the offenses are identical in law and fact. . . . The second

ues on appeal where, in his brief-in-chief, he argues that only one all-encompassing count could avoid multiplicity problems but, in his reply brief, writes that "[u]pon further reflection, . . . the proper number of charges should be two—one count for each diskette."

part, which we reach if the offenses are not identical in law and fact, is an inquiry into legislative intent.

The *Blockburger* test requires us to consider whether each of the offenses in this case requires proof of an element or fact that the other does not. If, under this test, the offenses are identical in law and fact, then charging both is multiplicitous and therefore unconstitutional. *If under the Blockburger test the offenses are different in law or fact, a presumption arises that the legislature intended to permit cumulative punishments for both offenses. This presumption can only be rebutted by clear legislative intent to the contrary.*

*Derango,* 2000 WI 89 at ¶¶ 27–30 (citations omitted; emphasis added). A challenge concerning the proper unit of prosecution for criminal conduct presents a question of law subject to our *de novo* review. *See State v. Sauceda,* 168 Wis. 2d 486, 492, 485 N.W.2d 1 (1992).

¶ 33. Therefore, this court first applies the *Blockburger* test to determine whether each of the offenses in this case requires proof of an element or fact that the others do not. The State acknowledges that, quite obviously, the charges are identical in law; each involves a violation of the same statute. *See State v. Anderson,* 219 Wis. 2d 739, 747, 580 N.W.2d 329 (1998). Almost as obviously, the charges are factually distinct; apparently each count refers to Multaler's possession of a different "page of printed child pornography."[17]

¶ 34. Offenses are different "in fact" if they are separated by time, or are significantly different in nature, or involve separate volitional acts. *State v. Davis,* 171 Wis. 2d 711, 717, 492 N.W.2d 174 (Ct. App. 1992). Separate volitional acts occur when the offender

---

[17] *See* n.11, above.

has sufficient time between acts to reflect on his or her actions and to recommit to the criminal conduct. *Id.* at 717–18. "[O]ffenses are significantly different in nature if each requires 'a new volitional departure in the defendant's course of conduct.' " *Anderson*, 219 Wis. 2d at 750. The fact that proof of one count may be, in many respects, the same as proof of other counts does not necessarily render the counts multiplicitous. *See id.* at 750–52; *see also State v. Warren*, 229 Wis. 2d 172, 182–83, 599 N.W.2d 431 (Ct. App.) (holding that multiple counts of perjury for separate statements in preliminary hearing testimony were not multiplicitous), *review denied*, 228 Wis. 2d 176, 602 N.W.2d 762 (1999).

¶ 35. Here, as the State correctly argues, Multaler, in retaining each pornographic page, made a separate decision. Had the case been tried, the State would have had to prove that Multaler not only knew that he possessed each page, but also that he knew each page depicted sexually explicit conduct, and that he knew or reasonably should have known that each page displayed a child under the age of eighteen years engaging in the sexually explicit conduct. *See* WIS. STAT. § 948.12.

■

¶ 36. As we have acknowledged, however, "multiple counts, even if different in fact and therefore not violative of double jeopardy, may still be multiplicitous if the legislature intended that multiple offenses . . . be brought as a single count or as a single 'unit of prosecution.' " *Warren*, 229 Wis. 2d at 184–85. Here, however, Multaler has failed to rebut the presumption that the legislature intended to permit multiple punishments for multiple offenses of possession of child pornography.

¶ 37. Multaler's multiplicity challenge presents a question of statutory construction subject to our *de novo* review. *See id.* at 185. WISCONSIN STAT. § 948.12 does not expressly state whether the legislature intended that multiple offenses be prosecuted as a single count. Where a statute does not specify the allowable unit of prosecution, we consider four factors to ascertain the legislature's intent: "(1) the statutory language; (2) the legislative history and context; (3) the nature of the proscribed conduct; and (4) the appropriateness of multiple punishment." *Warren*, 229 Wis. 2d at 185. We apply a " 'common-sense' view of the statute as a whole" to guide "our application of these four factors, and we seek a result that is 'reasonable and fair to offenders and society.' " *Id.* at 186. Doing so here, we conclude that the legislature intended to allow multiple punishments for multiple offenses of possession of child pornography.

¶ 38. First, focusing on the statutory language, Multaler maintains that "the legislature chose to itemize each *medium* on which . . . pornographic [material] might be contained (i.e. film, photographic negative, etc.)" and, therefore, that it plainly intended to prohibit "the possession of the medium containing the images." Thus, he suggests, individual pornographic images contained on a diskette are akin to individual frames of a "motion picture film" and, further, that if the legislature had intended prosecution for possession of each image, it would have said so.

■

¶ 39. Multaler is mistaken. His argument largely ignores the statutory language that all but refutes his premise. The statute prohibits possession of "*any* . . . photograph . . . or other pictorial reproduction . . . of a

child engaged in sexually explicit conduct." WIS. STAT. § 948.12 (emphasis added). Thus it allows for prosecution based not only on the medium, but also on each image conveyed by the medium. *See State v. A.H.*, 211 Wis. 2d 561, 567–68, 566 N.W.2d 858 (Ct. App. 1997) ("[T]he focus of the inquiry under [WIS. STAT. § 948.12] is the content of the photograph and how it was produced," not the medium of its storage.). Moreover, by referring both to "*any* photograph" and "*a* child," *see* § 948.12 (emphases added), the statute establishes the potential for prosecution for each image of each child engaged in sexually explicit conduct. *See State v. Hamilton*, 146 Wis. 2d 426, 438–41, 432 N.W.2d 108 (Ct. App. 1988) (statute written in the singular conveys legislative intent to permit individual count for each violation).

¶ 40. Second, in evaluating the legislative history and context, Multaler maintains that we should view WIS. STAT. § 948.12 as a "possession of contraband" statute, not a sexual assault statute. He contends, therefore, that charges under § 948.12 should proceed like the single counts against those who, at one time, possess several marijuana joints, rather than like the multiple counts against those who, within a single period of time, sexually assault a victim in a number of different ways. We disagree.

¶ 41. The note following the portion of the act creating WIS. STAT. § 948.12 reflects the legislature's intent to permit multiple punishments for offenses that are different in fact. The drafters referred to child pornography as "the 'fruits' of child sexual exploitation" and commented: "This prohibition against possession is intended to supplement the restrictions in the child sexual exploitation statute and thereby *more effectively deter and penalize the sexual abuse of children* than is

possible under current law." 1987 Wis. Act 332, § 55 (note following content of § 948.12) (emphasis added).

¶ 42. Third, addressing the nature of the proscribed conduct, Multaler contends that "[i]t is illogical to conclude that a person who possesses one pornographic photograph is guilty and a person who possesses one magazine with twenty-five pornographic pictures [is] twenty-five times more culpable." Although he comments that the legislature eventually "may see fit to create varying grades of offense as it has done with other contraband statutes," he otherwise fails to develop this theme. Accordingly, while we could decline to consider Multaler's contention, *see State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (appellate court "may decline to review issues inadequately briefed"), we address it to expose how his own admission defeats his premise.

¶ 43. Multaler admitted that he had downloaded many pornographic images with the intention of possibly selling them. Thus, he necessarily chose to possess some but perhaps not others he may have viewed, and he was able to decide how to separate and disseminate them. Each pornographic image, when separated from the others, carried the potential for commercial value. Thus, the nature of Multaler's proscribed conduct allowed for the multiple counts.

¶ 44. Fourth, asserting that multiple punishments would not be appropriate, Multaler reiterates several of his earlier arguments. But as the State responds: "What he refuses to admit is what is obvious: the [l]egislature has created a means of graduated penalties depending on the volume of child pornography possessed."

██

¶ 45. Because the offenses to which Multaler pled are different in fact, we must presume that "the legislature intended to permit cumulative punishments." *Derango*, 2000 WI 89 at ¶ 30. "This presumption can only be rebutted by clear legislative intent to the contrary." *Id.* Multaler has offered nothing to rebut the presumption. In fact, it is quite clear that the legislature intended to preserve the potential for multiple punishments. Accordingly, this court concludes that Multaler's convictions for twenty-eight counts of possession of child pornography are not multiplicitous.

## C. Sentencing

¶ 46. Finally, Multaler argues that his sentence is unduly harsh. He contends that "it is obvious that the court took into account the suspicions that were cast by the [S]tate throughout the case that [he] had strangled a number of women in the 1970s." While acknowledging that the court "did not specifically state that it was considering the suspicion that [he] was involved in prior murders," he asserts that "that is the only possible explanation for the court's sentence." The record refutes his claim.

¶ 47. At no time during Multaler's sentencing hearing did any of the participants—the prosecutor, defense counsel, Multaler, his daughter, or the judge—refer in any way to suspicions that Multaler had committed the four apparent murders. Further, in its written decision denying Multaler's postconviction motion, the court that sentenced him absolutely rejected his contention:

[Multaler] believes the only reasonable explanation for such a lengthy sentence is the court's conclusion that he was involved in some prior unsolved murders. The court completely rejects this contention and unequivocally asserts for the record that such considerations did not enter into its sentencing determination. The court based its sentence specifically on the nature of the offense—exploitation of children in a very horrific and vile fashion; the defendant's prior criminal history and sexual conduct; the defendant's mental health status and unpredictability; his sexual fantasies about choking children or sexual partners; and his stated intent to produce his own videotape of child pornography. Taking these factors into consideration, the court determined that the need for community protection from this defendant was of paramount importance. Given the *egregious nature* of the materials in Multaler's possession, the *particular character* of the defendant, and the *absolute need* for community protection from child pornography materials of this kind, the sentence structure imposed is not unduly harsh or excessive.

(Record references omitted.)

■■

¶ 48. Multaler has offered no argument suggesting any basis for this court to reject the court's own account of the factors that influenced its sentencing determination. *See Jung v. State*, 32 Wis. 2d 541, 548, 145 N.W.2d 684 (1966) (appellate court presumes that sentencing court acted reasonably). Thus, the record refutes the factual premise on which Multaler bases his only challenge to the sentence.

*By the Court.*—Judgment and order affirmed.

¶ 49. FINE, J. *(concurring)*. The dissent's analysis explains why if a magistrate had refused to issue a search warrant that decision would have been upheld on appeal. But our duty when reviewing a magistrate's decision to issue a search warrant is not to search the record for reasons why that decision was in error, but, rather, to see if the evidentiary material submitted to the magistrate could have reasonably persuaded a neutral judicial officer to believe that probable cause existed that the specified evidence would be found in the location to be searched. The chain of probable cause here is crafted of many sturdy links: the reasonable suspicion that Multaler was the serial killer authorities thought him to be; the practice of serial killer to keep—*forever*—mementos of their butchery; and that the residence to be searched was a likely repository for those bloody keepsakes. Accordingly, the magistrate acted well within his discretion in issuing the warrant, and, therefore, we must affirm.

¶ 50. CURLEY, J. *(dissenting)*. I respectfully dissent. Even giving the warrant-issuing judge's decision "great deference," there was no "substantial basis for . . . concluding that the probable cause existed," as claimed by the majority decision. "The ultimate test for issuance of a search warrant is whether there is probable cause to believe that the objects sought are linked to the commission of a crime and whether those objects are likely to be found in the place designated in the search warrant." *State v. Ehnert*, 160 Wis. 2d 464, 470, 466 N.W.2d 237 (1991) (citing *Ritacca v. Kenosha County Court*, 91 Wis. 2d 72, 77–78, 280 N.W.2d 751 (1979)).

¶ 51. Here, no magistrate or judge, acting reasonably, could have found that probable cause existed to search the Arrow Street residence for objects allegedly taken from four murder victims over twenty years ago. First, the search warrant was based entirely on stale information and stale probable cause. No new evidence was uncovered. In fact, the critical information linking Multaler to the murders was over twenty years old. Stale probable cause, defined as " 'probable cause that would have justified a warrant at some earlier moment that has already passed by the time the warrant is sought,' " cannot form the basis for issuing a search warrant. *State v. Moley*, 171 Wis. 2d 207, 213, 490 N.W.2d 764 (1992) (citation omitted). Here, any probable cause to support a search warrant which may have existed at some earlier time was stale by the time the warrant was sought.

¶ 52. The majority correctly notes that the test for staleness is done on a case-by-case basis. But here, because of the passage of over two decades, it was unreasonable to conclude that the information was fresh and that the objects were likely to be found in Multaler's house. The cases cited in the majority opinion, supporting the conclusion that the search warrant's information was not stale, involved time lags of less than a year between the discovery of the crucial evidence and a search warrant request. In *Ehnert*, the search warrant was issued only thirty days after the information came to light. *Ehnert*, 160 Wis. 2d at 470. In *Moley*, the search warrant was issued eleven months after an informant gave police a tip, but in the interim, the police continued their investigation. *Moley*, 171 Wis. 2d at 213–14. Indeed, in *Moley*, this court admitted that the information given to the officer eleven months before the search warrant request was "old."

*Id.* at 213. If eleven-month-old information is "old," then the twenty-three-*year*-old information relied upon here is positively "ancient." This court could find no case anywhere permitting a search based on information that was twenty-three years old. To appreciate how long twenty-three years is, consider the fact that the requesting officer, who claimed to be an expert on serial killers, did not join the Racine Police Department until fourteen years after the last murder was committed! Further, the majority sidesteps the requirement that information be "fresh" by concluding that the stale information was "revived by [the officer's] fresh analysis." This transformation of stale information into fresh information capable of supporting a probable cause finding muddies the case law touching on stale information and strains the strict time requirements for search warrants set forth in Wis. Stat. §§ 968.12 and 968.15. According to the majority, a search warrant can easily be issued or reissued whenever another law enforcement officer gives the stale information a "fresh analysis."

¶ 53. Moreover, even though probable cause might have existed in the past to search Multaler's residence because of a belief that he murdered four women and that his actions in doing so placed him in the compulsive "serial killer" category, any probable cause to search Multaler's house became stale over time. The fact that Multaler was never charged with any of the murders, had been released from prison for some time, and the murders did not resume, bodes against a probable cause determination twenty-three years later that he is the murderer, much less that he is a "serial killer" compelled to kill time after time. Suspicion alone cannot form the basis for a search warrant.

¶ 54. Finally, the majority opinion, in approving the search warrant, characterizes the officer's affidavit as being a "careful" one. I strongly disagree. The affidavit contained at least one serious error and it failed to advise the judge of other relevant and vital information that the officer surely must have known. First, the requesting officer stated in the affidavit that, based upon police reports, he knew that Multaler had lived at the residence for over twenty years. Incorrect. The officer had to have known that Multaler spent approximately ten of the last twenty-odd years in prison, as the search warrant made direct reference to his arrest. Also troubling is the fact that the Milwaukee Police Department reports, relied upon by the officer, reflect that when Multaler was arrested for the earlier offenses for which he was incarcerated, he did not live on Arrow Street; he lived on North Buffum Street in Milwaukee. Further, even assuming Multaler once lived at the Arrow Street address, the affidavit contained no proof that Multaler currently lived at the Arrow Street address. The officer's affidavit stated only that he had recently checked the registration of two cars parked at the Arrow Street address and he found they were registered to Multaler's wife and daughter. Given the unsavory account of Multaler's alleged sexual misconduct with his daughter in 1988, contained in the search warrant affidavit, it would seem unlikely that either his wife or his daughter would still be living with Multaler in 1998. Also, the officer stated in the affidavit that Multaler was convicted of "kidnapping." Actually, Multaler was convicted of false imprisonment, operating a vehicle without the owner's consent, endangering safety by conduct regardless of life, and carrying a concealed weapon. These mistakes, omissions and inconsistencies show that the officer's

affidavit was not carefully crafted and the warrant-issuing judge should have detected the inconsistencies and omissions in the affidavit.[1] No probable cause existed here at the time of the search warrant's issuance.

¶ 55. Although I am mindful that the search resulted in uncovering evidence of Multaler's extensive child pornography collection, the harm done to the rights guaranteed by the Fourth Amendment by legitimizing this search warrant is too great to ignore. Therefore, I respectfully dissent.

[1] While the warrant-issuing judge would not have known of the subsequent events, hindsight supports my conclusion that no probable cause existed here. No evidence of the murders was found at Multaler's residence and DNA tests excluded Multaler as the person whose blood was found under the fingernail of one of the victims.