STATE of Wisconsin, Plaintiff-Respondent,

v.

James E. MULTALER, Defendant-Appellant-Petitioner.

Supreme Court

*No. 00–1846–CR. Oral argument February 5, 2002.—Decided April 25, 2002.*

2002 WI 35

(Also reported in 643 N.W.2d 437.)

55

For the defendant-appellant-petitioner there were briefs by *Jeffrey W. Jensen* and *Law offices of Jeffrey W. Jensen,* Milwaukee, and oral argument by *Jeffrey W. Jensen.*

For the plaintiff-respondent the cause was argued by *Sandra L. Nowack,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, James Multaler, seeks review of a published court of appeals decision affirming his conviction on a plea to 28 counts of possession of child pornography.[1] Police found the pornographic materials in Multaler's house while executing a search warrant for evidence implicating him in a series of homicides. He asserts that the affidavit accompanying the warrant application was insufficient to establish probable cause to believe that items relating to the homicides would be located in his house. In addition, he argues that his plea is invalid because the charges to which he pled are multiplicitous as contrary to the legislatively intended unit of prosecution.

¶ 2. We determine that the affidavit provided a substantial basis to conclude that there was a fair probability that evidence relating to the homicides would be found in Multaler's house. In addition, we determine that the 28 charges to which Multaler pled were not multiplicitous. Accordingly, we affirm the court of appeals.

I

¶ 3. This case arises from an investigation of the disappearance and homicide of four young women from Milwaukee in 1974 and 1975. Multaler became a sus-

---

[1] *See State v. Multaler,* 2001 WI App 149, 246 Wis. 2d 752, 632 N.W.2d 89 (affirming a judgment and an order of the Circuit Court for Milwaukee County, Jeffrey A. Wagner, Judge).

pect in their homicides. On May 18, 1998, more than 20 years after the homicides, police obtained a warrant to search his home for evidence of those crimes. In the course of executing the warrant, police discovered two computer disks containing images of children engaged in sexually explicit activity.[2] Based on the contents of the disks, Multaler was charged with 79 counts of possession of child pornography in violation of Wis. Stat. § 948.12 (1997–98).[3]

¶ 4. Multaler moved to suppress the disks, arguing that the affidavit in support of the warrant to search his house was insufficient to establish probable cause. The circuit court denied Multaler's motion, and Multaler subsequently entered an *Alford* plea[4] to 28 of the 79 counts. The remaining 51 counts were dismissed. Multaler appealed, and the court of appeals affirmed his conviction.

¶ 5. This case presents two issues. First, we must determine whether the affidavit in the application for the search warrant for Multaler's residence was sufficient to establish probable cause to search his home for items related to the homicides. Second, we must deter-

---

[2] The disks were labeled "Child Pornography" and "Child Pornography II." After police discovered the disks, they obtained another warrant authorizing a search of the disks' contents.

[3] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

[4] An *Alford* plea is a guilty or no contest plea in which the defendant either maintains innocence or does not admit to the commission of the crime. *State ex rel. Jacobus v. State,* 208 Wis. 2d 39, 54, 559 N.W.2d 900 (1997); *see also North Carolina v. Alford,* 400 U.S. 25 (1970).

mine whether Multaler's plea was invalid because he pled to charges that were multiplicitous. We address each issue in turn.

## II

¶ 6. Multaler asserts that the affidavit in support of the warrant did not establish probable cause to search. Thus, we begin by setting forth the standards implicated in our review of probable cause in the search warrant context.

¶ 7. We accord great deference to the warrant-issuing judge's determination of probable cause, and that determination will stand unless the defendant establishes that the facts are clearly insufficient to support a finding of probable cause. *State v. Higginbotham,* 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991). Thus, "[t]he burden of proof in a challenge to the existence of probable cause for the issuance of a search warrant is clearly with the defendant." *State v. Edwards,* 98 Wis. 2d 367, 376, 297 N.W.2d 12 (1980).

¶ 8. The duty of the court issuing the warrant is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before it, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Higginbotham,* 162 Wis. 2d at 990. In addition, the warrant judge may draw reasonable inferences from the evidence presented in the affidavit. *State v. Benoit,* 83 Wis. 2d 389, 399, 265 N.W.2d 298 (1978).

¶ 9. With these considerations in mind, we turn to examine the affidavit in light of Multaler's arguments that it is insufficient. The thrust of the affidavit,

62

submitted by Investigator John Hanrahan, was this: Hanrahan and another detective were investigating the disappearance and subsequent homicides of four young women, Wendy B., Susan W., Sherry M., and Cynthia F., from Milwaukee in 1974 and 1975; Multaler not only killed the four young women but also was a serial killer as evidenced by his behavior that was consistent with that expected of serial homicide offenders; as serial killers are wont to do, he collected and retained various mementos to remind him of the murders, including items taken from the victims; although it was more than 20 years since the time of the murders, these items were likely to be found in his house because serial killers retain such items indefinitely.

¶ 10. In support of his assertion that the affidavit submitted to obtain the search warrant was insufficient, Multaler first argues that the affidavit fails to establish probable cause that he was the killer in the homicides under investigation. He also disputes whether the affidavit establishes that he was a serial killer. Finally, he contends that the affidavit fails to provide probable cause to believe that evidence of the murders would remain in his house more than 20 years later.

¶ 11. Considering all the information in the affidavit and our standard of review, we are satisfied that the affidavit supports a finding of probable cause to search Multaler's house. The affidavit leads us to the conclusion that there was a substantial basis upon which the warrant judge could determine that there was a fair probability that the mementos sought would be found in Multaler's residence at the time the warrant was executed. In short, we determine that Multaler has failed to establish that the affidavit was clearly insufficient to establish probable cause to search.

¶ 12. Multaler first contends that the affidavit fails to establish probable cause to believe that he was the killer. He deems this necessary to a determination of probable cause to believe that his house contained the mementos indicated in the search warrant. The State, in contrast, does not concede that probable cause to search in this case depends upon probable cause to arrest Multaler for the murders. We need not determine whether separate probable cause to arrest was necessary, but disagree with Multaler insofar as we determine that the affidavit supports a determination of probable cause to believe that Multaler was the killer. The affidavit connected the murders to one another, directly connected Multaler to the murders of two of the women, and circumstantially connected him to all of the murders.

¶ 13. All four victims were white females between the ages of 15 and 21 at the time of their disappearance. They resided in Milwaukee and disappeared within a 16–month time frame. Three of the victims were found in Racine County, and one was found in Milwaukee County.

¶ 14. Each of their bodies showed evidence of rape or other physical assault. Two of the victims were found with their shirts pulled up over their breasts, and another was found with semen in her vagina and blood under her fingernails. Two were strangled to death and another, whose cause of death could not be determined due to decomposition of the body, had numerous contusions on her head and face.

¶ 15. All but one of the victims were missing small personal items. For example, Wendy B. wore a Mickey Mouse watch that was never located. A missing persons report indicated that she was also wearing a braided macramé bracelet, but the bracelet was never found.

Susan W. was wearing an opal pin on a yellow gold necklace when she disappeared, but the pin and chain were not located.

¶ 16. When Sherry M.'s body was found, she was missing a gold ball-type earring and a pair of eyeglasses, neither of which were ever found. Sherry M. always wore a chain necklace with a butterfly pendant that also never was located. Several items were missing from her purse, including a hairbrush, a bottle of perfume, a picture ID, and photographs of friends.

¶ 17. The affidavit directly connected Multaler to two of the victims. He admitted to being with Wendy B. the night she disappeared. On one occasion he stated he could not recall whether he killed Wendy B., but on another occasion he stated that he felt that he had killed her, that "[i]f she is dead I must have killed her." In addition, when Multaler was asked to describe the clothing Wendy B. was wearing, he described Susan W.'s clothing instead. Thus, the affidavit directly linked Multaler to both Wendy B. and Susan W.

¶ 18. Additionally, the affidavit provided a circumstantial connection between Multaler and Susan W. When her purse was located, a bungee cord was found near it. One of the hooks on the bungee cord was pulled and bent in such a way that the hook was shaped into the form of the letter "L," and Multaler's ex-girlfriend identified it as identical to one she had observed in Multaler's possession.

¶ 19. The affidavit also circumstantially connected Multaler to the third victim, Cynthia F., in two ways. First, a note was found in Cynthia F.'s pocket bearing the name "James McDonald," and Multaler's ex-girlfriend stated that when she was staying with Multaler in 1975, she observed this name on a piece of paper near the telephone.

¶ 20. Second, the circumstances surrounding Cynthia F.'s disappearance were consistent with the circumstances surrounding a 1975 kidnapping for which Multaler was convicted. Specifically, in June 1975, a woman experienced an incident in which she was driving on the freeway when she heard a voice over a loudspeaker from a man in the car behind her. The man said that he was a state police officer and ordered her to pull her car to the side of the road. After approaching her, the man pulled out a pistol, handcuffed her, and threatened to shoot her if she did not comply. He took her to his vehicle, and she asked him to turn off her headlights. When he got out of the car to do so, she drove off in his car. Multaler was identified as a suspect in this incident and subsequently convicted for kidnapping. Similarly, when Cynthia F. disappeared in January 1974, her car was found parked approximately 12 to 14 feet from the curb with its ignition switch in the "accessory" position. Although it was a cold and snowy day, her driver's side window was down.

¶ 21. Finally, the affidavit circumstantially connected Multaler to the fourth homicide victim, Sherry M., although the connection is not as strong as that between Multaler and the other victims. When Sherry M.'s body was found, her wrist bore a mark three-eighths of an inch in width that appeared to have been made by something that was tightly wrapped around it prior to her death, as if she had been handcuffed. According to the affidavit, the width of a pair of handcuffs is three-eighths of an inch, and during the kidnapping for which Multaler was convicted, he used handcuffs on the victim.

¶ 22. Other statements in the affidavit provided further strong links between Multaler and the murders. After a newspaper article appeared detailing Multaler's

kidnapping arrest, the Milwaukee County District Attorney received a copy of the article with the following words written at the top: "This man is the South Side Killer . . . He has raped 36 girls." A handwriting expert determined that the writing on the article was Multaler's.

¶ 23. The affidavit also showed that the circumstances of some of the murders, which suggested strangulation and violent sex crimes, were consistent with Multaler's sexual proclivities. Multaler admitted that he had choked several of his girlfriends and that after they were weak and helpless, he felt more like a man in his sexual relations with them.

¶ 24. Further, the affidavit stated that Multaler's ex-girlfriend told investigators that before every sexual act, Multaler would place his fingers on her neck and apply pressure, rendering her unconscious. During this state of unconsciousness, Multaler would undress her and begin to have intercourse with her. On a few occasions, he had difficulty reviving her. Likewise, the affidavit explains that Multaler's daughter filed a report detailing years of sexual assaults by Multaler, in which he would "choke her out."

¶ 25. Taken together, all of this information directly connected Multaler to the murders of two of the women, circumstantially connected him to all of the murders, and connected the murders to one another. Thus, we determine that the affidavit supported a finding of probable cause to believe that Multaler was the killer.

¶ 26. Having made this determination, we next address Multaler's argument that the affidavit fails to establish sufficiently that he was a serial killer. In doing so, we turn to the portions of the affidavit focusing on

the patterns of behavior of serial homicide offenders and describing Multaler's behavior that was consistent with these patterns.

¶ 27. Investigator Hanrahan explained in the affidavit that serial homicide offenders often do all of the following:

> take clothing, jewelry and other property such as photo's [sic], identification and other personal items from their victims. These items are used by the offender to relive and recapture the moment of the homicide event, where often times the offender feels that he now possesses the victim. These items are used by the offender to fuel his fantasies and confirm the victim possession until the fantasy is no longer enough, such that he has to go out and find another victim.
>
> . . . keep newspaper clippings about the death and subsequent police investigation of his [sic] victims. These items also help the offender in his fantasies, and act as proof and reminders of his act.
>
> . . . keep written documentation such as diaries for the reasons detailed above.
>
> . . . take photographs, as well as audio and video recordings of their victims.
>
> . . . keep these items . . . even under intense police investigation. The need to keep these items as reminders and fantasy tools outweighs the risk of being caught by possessing such incriminating evidence.
>
> . . . often times interject themselves into the investigation and or taunt investigators.

¶ 28. The affidavit also established particular instances in which Multaler acted consistent with these traits of serial killers. It stated that Multaler's ex-

68

girlfriend told investigators that he kept an album containing pictures of females and newspaper articles about missing and murdered females. She identified an article detailing the discovery of Susan W.'s body as possibly being an article in Multaler's album. His ex-girlfriend also stated that when she lived with Multaler in 1975, she observed in one of his two scrap books an article reporting a fifth strangulation murder in Green Lake to which Multaler may have been linked.

¶ 29. Further, as already noted, Multaler apparently sent the Milwaukee County District Attorney a newspaper clipping indicating that he was the "South Side Killer." He also sent a letter to the Channel 6 news department requesting newspaper clippings or written articles concerning the murders of Cynthia F., Susan W., Wendy B., and Sherry M. At oral argument before this court, Multaler's attorney agreed that the affidavit showed that Multaler had a "fairly unusual interest in these cases."

¶ 30. Thus, the affidavit documented particular instances in which Multaler collected or sought to collect the types of mementos serial killers are known to collect and retain, including instances in which such items were observed in his possession. The affidavit also showed that, consistent with the expected behavior of serial killers, Multaler interjected himself into an investigation of the murders. The instances of his violent sexual behavior with his ex-girlfriend and daughter were also consistent with traits described by Investigator Hanrahan, in particular that serial homicide offenders need to feel a sense of possession over their victims. All of these facts taken together sufficiently establish for purposes of the warrant that Multaler was a serial killer.

¶ 31. Because the affidavit established particular instances in which Multaler exhibited characteristic patterns of behavior typical of a serial homicide offender, it was reasonable for the warrant judge to infer that Multaler would exhibit other characteristics that Investigator Hanrahan indicated were associated with serial homicide offenders. Thus, the judge could reasonably infer that Multaler had taken the missing personal items from the victims and would retain these items.

¶ 32. Multaler's album and scrap books observed by his ex-girlfriend indicated specific instances in which he collected and retained mementos of killings to which he was linked. Tethered to Hanrahan's research and expertise, these facts, along with the other particular instances of Multaler's behaviors, established the reasonable inference that he would be likely to retain the mementos more than 20 years after the murders.

¶ 33. Finally, the affidavit provided reason to believe these mementos would be found in Multaler's house. Investigator Hanrahan stated in the affidavit that Milwaukee police records indicated that Multaler had the same residence for over 20 years. Hanrahan stated that he recently had driven by the house and verified that the two cars parked in the driveway were registered to Multaler's wife and daughter. Thus, assuming that Multaler retained mementos of his killings, the warrant judge had no reason to infer that they would be located anywhere other than in Multaler's house. In sum, considering all of the facts and circumstances set forth in the affidavit, we determine that it provided a substantial basis from which the warrant judge could determine there was a fair probability the items sought in the warrant would be found in Multaler's house.

¶ 34. We emphasize that every probable cause determination must be made on a case-by-case basis, looking at the totality of the circumstances. Even when police suspect an individual is a serial killer, that will not always yield probable cause to search the individual's home. Multaler's case presents unusual facts, and as we have explained, particular circumstances that established probable cause to search his house for specific items incriminating him in the homicides that were under investigation. As Judge Fine concluded in his concurring opinion in support of the court of appeals majority, "[t]he chain of probable cause here is crafted of many sturdy links." *State v. Multaler*, 2001 WI App 149, ¶ 49, 246 Wis. 2d 752, 632 N.W.2d 89. In another case with different facts, the chain may not be so sturdy.

¶ 35. Multaler nonetheless asserts that the affidavit was insufficient to establish that the mementos would remain in his residence more than 20 years after the homicides. In making this assertion, he first argues that the information in the affidavit was "stale" such that no inference could be drawn that the items the police sought would be located in his home more than 20 years after the murders. We disagree and determine that the concept of staleness is not a bar to probable cause under the unique circumstances of this case.

¶ 36. A distinction must be maintained between stale information and stale probable cause. *State v. Moley*, 171 Wis. 2d 207, 212, 490 N.W.2d 764 (Ct. App. 1992).

> Stale probable cause, so called, is probable cause that would have justified a warrant at some earlier moment that has already passed by the time the warrant is sought.
>
> There is not, however, any dispositive significance in the mere fact that some information offered to demonstrate probable cause may be called stale, in the sense that it occurred well before the date of the application for the warrant.

*Id.* at 213 (citing *State v. Valenzuela,* 536 A.2d 1252, 1264 (N.H. 1987)). If old information in a warrant affidavit contributes to an inference that probable cause exists at the time of the application for the warrant, the age of the information is no taint. *Id.* at 210.

¶ 37. The probable cause determination in the face of a staleness challenge depends upon the nature of the underlying circumstances, whether the activity is of a protracted or continuous nature, the nature of the criminal activity under investigation, and the nature of what is being sought. *State v. Ehnert,* 160 Wis. 2d 464, 469–70, 466 N.W.2d 237 (Ct. App. 1991). A Maryland case has stated the factors similarly:

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily trans-ferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a halfsmoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the

cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later.

*Andresen v. State,* 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975), *aff'd, Andresen v. Maryland,* 427 U.S. 463 (1976); *see also* Wayne R. LaFave, *2 Search & Seizure* § 3.7(a), 341 (3d ed. 1996).

¶ 38. These observations illustrate that the concept of staleness is not so much an independent bar to a determination of probable cause as it is a function of the essence of the probable cause determination. " '[S]taleness' is not a separate doctrine in probable cause to search analysis. It is merely an aspect of the Fourth Amendment inquiry." *People v. Russo,* 487 N.W.2d 698, 707 (Mich. 1992). As with any determination of probable cause to search on a warrant, the determination must be made on a case-by-case basis. *See Ehnert,* 160 Wis. 2d at 469.

¶ 39. Multaler's position is that these staleness precepts undermine any conclusion that there was a fair probability the items sought in the warrant would be found in his house more than 20 years after the murders. To the contrary, we think they reinforce such a conclusion.

¶ 40. This is a case that depends, in part, upon the unusual tendency of serial homicide offenders, as stated in the affidavit, to collect and retain items that constitute evidence of their crimes. As already explained, the likelihood that Multaler was a serial killer who would retain possession of the items sought, even more than 20 years after the murders, is established sufficiently by the information in the affidavit.

¶ 41. At the time the warrant issued and was executed, the probable cause to search Multaler's house was not stale. The type of criminal behavior being investigated was recurring, entrenched, and continuous. The nature of the criminal activity, serial homicide, and the nature of the items sought, the sort of items likely to be retained indefinitely by the killer, both lead to the conclusion that probable cause to search Multaler's house was not stale. None of the factors outlined in *Ehnert* or *Andresen* when applied here leads to a conclusion that the evidence sought would not remain in Multaler's house.

■■■■■

¶ 42. Multaler also advances other arguments in support of his assertion that the affidavit was insufficient to establish that the mementos would be found in his residence when the warrant was executed. He argues that Investigator Hanrahan's opinions cannot be used to support a finding of probable cause because Hanrahan had no personal experience investigating serial killers and because he did not cite the sources upon which he based his opinion. We disagree.

¶ 43. This court has explained on at least one prior occasion that both the experience and special knowledge of police officers who are applying for search warrants are among the facts that the warrant-issuing court may consider. *State v. Harris,* 256 Wis. 93, 100, 39 N.W.2d 912 (1949). Similarly, other courts have stated that a government agent's expert opinion may be considered by the issuing court when making its probable cause determination. *See, e.g., United States v. Rabe,* 848 F.2d 994, 997 (9th Cir. 1988). Multaler does not dispute these propositions, and he cites no case law holding that in all cases a warrant affiant must possess

both field experience pertaining to the type of crime in question and specialized knowledge obtained through other means.

¶ 44. The affidavit shows that Investigator Hanrahan exhaustively researched and studied the patterns of serial homicide offenders. His statements regarding the typical characteristics of serial killers were based upon a number of expert sources, for which he supplied names, authors, and credentials. In addition, Hanrahan stated in the affidavit that he attended various training courses or symposia on the subject of serial killers, some of which were taught by the experts who had written materials Hanrahan studied.

¶ 45. There can be no question that Investigator Hanrahan possessed specialized knowledge pertaining to traits common to serial killers based on his extensive study of the topic. His lack of previous field experience investigating serial homicide is not a bar to his qualifications to give opinions about the behavior of serial killers for purposes of a warrant.

¶ 46. Nonetheless, Multaler contends that it was necessary for Investigator Hanrahan to cite the sources upon which he relied for the opinions he offered about serial homicide offenders. In Multaler's reply brief, he states, "[i]f Hanrahan's affidavit were a research paper it would be graded as an F."

¶ 47. These assertions misapprehend the nature of the warrant judge's inquiry. An affidavit in support of a search warrant is not a research paper or legal brief that demands citations for every proposition. For purposes of warrant applications, "the evidence thus collected must be seen and weighed not in terms of library

analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates,* 462 U.S. 213, 232 (1983).

¶ 48. Investigator Hanrahan's detailed listing of his sources of information and accompanying credentials, combined with his indication that his opinion was based upon his "training and research" provided a sufficient foundation for the opinion he gave about the behavior patterns of serial killers. At oral argument, even Multaler conceded that the affidavit might be saved by Hanrahan's opinion regarding the propensity of serial killers to keep mementos had it not been rendered infirm by Hanrahan's lack of citation to authority. We see no such infirmity. Rather, we agree with the analysis the State gives in its brief:

> The affidavit might have been flawed as conclusory if Hanrahan had merely asserted the general proposition that he was qualified to offer information about serial killers. That is not what Hanrahan did. He identified the authority underlying his statements, and established that his reliance on the sources was reasonable.

¶ 49. In sum, the affidavit provided probable cause to believe that Multaler was the killer in the homicides under investigation. It also sufficiently supported the conclusion that he was a serial killer likely to collect and retain mementos of the killings and that those mementos would remain in his house at the time the warrant was executed. Neither staleness nor the manner in which Investigator Hanrahan set forth his expertise in the affidavit undermines these conclusions. The affidavit provided a substantial basis to conclude that there was a fair probability that the items the police sought would be found in Multaler's house when the warrant was executed.

¶ 50. Next, we turn to Multaler's assertion that he pled to multiplicitous charges. Although the police seized only two computer disks containing child pornography, each disk contained multiple images. Multaler was originally charged with 79 counts of possession of child pornography based on the number of images contained on the disks. Ultimately, however, Multaler pled to only 28 counts.

¶ 51. Multaler now argues that the charges were multiplicitous because the legislature did not intend that a separate charge could be levied for each separate pornographic image. He asserts that the legislatively intended unit of prosecution is determined by the number of disks, not the number of images.

¶ 52. Whether a multiplicity violation exists in a given case is a question of law subject to independent appellate review. *State v. Koller,* 2001 WI App 253, ¶ 32, 248 Wis. 2d 259, 635 N.W.2d 838. This court analyzes claims of multiplicity using a two-part test. *State v. Anderson,* 219 Wis. 2d 739, 746, 580 N.W.2d 329 (1998). First, we apply *Blockburger v. United States,* 284 U.S. 299, 304 (1932), asking whether the offenses are identical in law and fact. *State v. Derango,* 2000 WI 89, ¶ 29, 236 Wis. 2d 721, 613 N.W.2d 833; *Anderson,* 219 Wis. 2d at 746. Second, if the offenses are not identical in law and fact, we ask whether the legislature intended multiple punishments for the offenses in question. *Anderson,* 219 Wis. 2d at 746.

¶ 53. The State concedes that the 28 charges of child pornography possession for which Multaler was convicted are identical in law because they fall under the same statute. Turning to the question of whether

the offenses are identical in fact, we note, as does the State, that Multaler does not appear to take a position on the question. Rather, he makes his arguments only under the second part of the multiplicity test, asserting that the legislature intended that the proper unit of prosecution was one charge for each disk rather than one charge for each image on the disk.[5]

¶ 54. Taking Multaler's position as a concession that the charges are different in fact, the State asserts that Multaler has waived his multiplicity claim. Although a guilty or no contest plea generally waives all nonjurisdictional defects, including constitutional claims, *State v. Riekkoff*, 112 Wis. 2d 119, 123, 332 N.W.2d 744 (1983), a double jeopardy defect in the plea is an exception to the waiver rule, *State v. Morris*, 108 Wis. 2d 282, 284 n.2, 322 N.W.2d 264 (1982). The State refers us to *State v. Trawitzki*, 2001 WI 77, ¶ 22, 244 Wis. 2d 523, 628 N.W.2d 801, however, in which this court noted that it is only the first part of the multiplicity test that involves the constitutional double jeopardy provisions. Thus, the State reasons, because Multaler is relying only on the second part of the multiplicity test, he is not asserting a constitutional claim of double jeopardy and has waived his claim for multiplicity.

¶ 55. We appreciate the careful chain of logic the State has constructed in support of its position on waiver. However, we address Multaler's multiplicity claim on its merits because at least one of the links in

---

[5] In the conclusion section of his brief in chief, Multaler requested that all but one of the charges be dismissed. However, at oral argument, he agreed that under his analysis, two charges could stand, one for each disk.

the State's chain may be problematic. In particular, although Multaler has not argued that the charges are identical in fact, he has not expressly conceded the issue.[6] The State's position on waiver depends on the assumption that Multaler has made such a concession. The court of appeals addressed the question of whether the charges were identical in fact even though Multaler made multiplicity arguments in his court of appeals briefs similar to those he makes before this court.

¶ 56. Thus, we briefly turn to the question of whether the offenses are identical in fact. The inquiry into whether offenses are identical in fact involves a determination of whether the charged acts are "separated in time or are of a significantly different nature." *State v. Eisch,* 96 Wis. 2d 25, 31, 291 N.W.2d 800 (1980). The separate in time inquiry is not resolved by a stopwatch approach. *Harrell v. State,* 88 Wis. 2d 546, 572, 277 N.W.2d 462 (Ct. App. 1979). Rather, the court asks whether there was sufficient time for reflection between the acts such that the defendant re-committed himself to the criminal conduct. *State v. Hirsch,* 140 Wis. 2d 468, 475, 410 N.W.2d 638 (Ct. App. 1987).

¶ 57. Similarly, whether the charged acts are significantly different in nature is not limited to a straightforward determination of whether the acts are of different types. *Koller,* 2001 WI App 253, ¶ 31. Acts may be "different in nature" even when they are the same types of acts as long as each required "a new volitional

---

[6] In addition, Multaler disputes other aspects of the State's waiver argument. We need not decide whether the State or Multaler is correct since we decide Multaler's multiplicity claim on the merits.

departure in the defendant's course of conduct." *Id.* (quoting *Anderson,* 219 Wis. 2d at 750).

¶ 58. Applying these standards, we agree with the court of appeals that the 28 counts to which Multaler pled were not identical in fact. Although some of the downloaded image files contained multiple images, there were more than 28 separate image files. In a statement given after his arrest, Multaler admitted that he "began downloading . . . in the winter of 1998," thus suggesting that he obtained the image files over a period of time. Even had he downloaded all the image files in a very short period of time, the fact that there were more than 28 separate files supports a conclusion that he made a new decision to obtain each one. Every time he downloaded a new file, he recommitted himself to additional criminal conduct. Each decision to download more child pornography represented a new volitional departure.

¶ 59. Having determined that the charges are different in fact, we turn to examine the legislature's intent regarding the allowable unit of prosecution.[7]

---

[7] Our analysis applies to the version of Wis. Stat. § 948.12 in effect at the time of Multaler's conduct resulting in the charges. The legislature subsequently amended § 948.12. *See* 2001 Wis. Act 16, § 3983. Section 948.12(1m) now provides: "Whoever possesses any undeveloped film, photographic negative, photograph, motion picture, videotape or other recording of a child engaged in sexually explicit conduct under all of the following circumstances is guilty of a Class E felony . . . ." The term "recording" for purposes of Wis. Stat. ch. 948 is now defined to include "the creation of a reproduction of an image or a sound or the storage of data representing an image or a sound." 2001 Wis. Act 16, § 3968.

Where charges are different in fact, we presume that the legislature intended multiple punishments. *Anderson,* 219 Wis. 2d at 751. This presumption is rebutted only by a clear indication of legislative intent to the contrary. *Id.* We use four factors to determine legislative intent in a multiplicity analysis: (1) statutory language; (2) legislative history and context; (3) the nature of the proscribed conduct; and (4) the appropriateness of multiple punishments for the conduct. *Id.*

¶ 60. Multaler focuses on the first and fourth factors and concludes from his application of these two factors that the legislature intended punishment based not upon an image but upon the medium, in this case computer disks, on which the images were found. However, we determine that Multaler has failed to rebut the presumption that the legislature intended to allow punishment for each image on the disks.

¶ 61. In applying the first factor, we look at the language of the statute. Section 948.12 provides:

> Whoever possesses any undeveloped film, photographic negative, photograph, motion picture, videotape or other pictorial reproduction or audio recording of a child engaged in sexually explicit conduct under all of the following circumstances is guilty of a Class E felony . . . .

¶ 62. We do not agree with Multaler that the plain language of the statute allows for prosecution based only upon the medium rather than upon the image.[8]

---

[8] Although neither party cites the case, we note that in *State v. Whistleman,* 2001 WI App 189, ¶ 1, 247 Wis. 2d 337, 633 N.W.2d 249, the court of appeals determined that computer disks that store images of child pornography are included within the meaning of the phrase "or other pictorial reproduction" in Wis. Stat. § 948.12. The court in *Whistleman,* however,

Multaler's own dictionary-derived definitions of "reproduction" undermine his plain language argument. One of the definitions Multaler gives in his brief is that a reproduction is "a copy of something printed, scanned, photographed, or produced by other means." This definition encompasses the images stored on Multaler's disks which themselves are copies of something that was once printed, scanned, or photographed.[9]

¶ 63. In *State v. A.H.*, 211 Wis. 2d 561, 567–68, 566 N.W.2d 858 (Ct. App. 1997), the court of appeals determined that "the focus of the inquiry under [§ 948.12] is the content of the photograph and how it was produced, not the particular location or manner in which it is ultimately stored or kept by the person possessing it." The court in *A.H.* was not addressing a multiplicity claim and thus *A.H.* is not on all fours with the issue before us. Nonetheless, the *A.H.* court made this determination in the course of discerning the legislative intent behind § 948.12, and it is persuasive evidence that Multaler's read of the statute is incorrect.

was not confronting a multiplicity challenge. Rather, it was determining whether the possession of child pornography on a computer disk was even covered by the language of the statute. The *Whistleman* court's analysis does not preclude a determination that an image on a disk is itself a "pictorial reproduction."

[9] Multaler has not asserted that the images in this case originally were created by a means other than photography of actual children, and we need not address the legislative intent with regard to such "virtual" child pornography. *See Ashcroft v. The Free Speech Coalition*, 122 S.Ct. 1389, ___ U.S. ___ (2002) (holding overbroad and unconstitutional a provision of the federal Child Pornography Prevention Act that bans virtual child pornography). The Act appears at 18 U.S.C. § 2251 et seq. *See Ashcroft*, 122 S. Ct. at 1396.

¶ 64. Nothing in the plain language of Wis. Stat. § 948.12 supports Multaler's position that the legislature intended that a computer disk, rather than an image, is the intended unit of prosecution. Rather, the plain language of the statute provides that a possessor of "*any* photograph . . . or other pictorial reproduction" has violated the statute. Section 948.12 (emphasis added). The singular formulation of these items covered under the statute modified by the term "any" is evidence that the legislature intended prosecution for each photograph or pictorial reproduction.[10] In short, the plain language of the statute leads us to the conclusion that for purposes of the second part of the multiplicity analysis each image Multaler possessed could be prosecuted separately.

¶ 65. Applying the fourth factor, Multaler asserts that it is inappropriate to impose separate punishments for each separate image possessed. In support of this assertion, he provides a number of hypothetical comparisons. For example, he explains that a legislative intent to charge for each image would be devoid of logic in the context of a movie film where possession of one movie could result in thousands of charges, one charge for each frame of the film.

¶ 66. We reject Multaler's assertions that these sorts of examples indicate that the legislature could not have intended multiple punishments in cases involving

---

[10] In *State v. Hamilton,* 146 Wis. 2d 426, 438–39, 432 N.W.2d 108 (Ct. App. 1988), the court of appeals discussed the legislative intent component of the multiplicity test in the context of Wis. Stat. § 943.37, the statute criminalizing the alteration of serial numbers. The court discussed the singular phrasing of a statute as indicative of a legislative intent to authorize multiple prosecutions. *Id.*

pornography downloaded from the internet. If the proper unit of prosecution were limited to the disk or other storage device, an individual could possess thousands of images depicting children in sexually explicit activity and face only once charge under § 948.12. We agree with the State's argument that "[i]t is unreasonable to suggest that the legislature intended a single penalty . . . without regard for the volume of child pornography, the time over which it was accumulated, the number of separate volitional acts required to obtain and store it, or the numbers of children victimized." In Multaler's case, where he downloaded, compiled, and stored multiple images over time, multiple punishment is appropriate.

¶ 67. In essence, because it appears that the images on the disks were photographs of actual children, the disks served as electronic photo albums. The language of § 948.12 shows that the legislature would deem it appropriate to bring separate charges for separate photographs in a traditional photo album. Similarly, the legislature presumably would deem separate charges appropriate for individual images displayed in an electronic photo album.

¶ 68. Because the two factors upon which Multaler relies do not support his assertion that the proper unit of prosecution in his case is determined by the number of disks, he has failed to rebut the presumption that the legislature intended multiple punishments. Therefore, we reject his multiplicity claim.

IV

¶ 69. In sum, we conclude that the 28 charges to which Multaler pled were not multiplicitous. We further conclude that Investigator Hanrahan's affidavit

provided a substantial basis to determine that there was a fair probability that the evidence the police sought in the warrant would be found in Multaler's house. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 70. DIANE S. SYKES, J., did not participate.