STATE of Wisconsin, Plaintiff-Respondent,

v.

Jack P. LINDGREN, Defendant-Appellant.†

Court of Appeals

*Nos. 03–1868–CR, 03–1869–CR. Submitted on briefs February 23, 2004.—Decided July 21, 2004.*

**2004 WI App 159**

(Also reported in 687 N.W.2d 60.)

† Petition to review denied 10-19-04.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Stephen M. Compton* of *Thorpe, Compton & Christian, S.C.*, Delavan.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Shannon Wittenberger*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. SNYDER, J. Jack P. Lindgren appeals from a judgment of conviction for five counts of possession of child pornography contrary to Wis. Stat. §§ 948.12 and 939.50(3)(e) (2001–02),[1] one count of child enticement contrary to Wis. Stat. § 948.07, and one count of manufacturing-delivering tetrahydrocannabinols (THC) contrary to Wis. Stat. § 961.41(1)(h)1. Lindgren contends that the warrant allowing the police to search his home was illegal, and therefore the evidence discovered and used against him as a result of the illegal search should have been suppressed. He further contends that the evidence against him on the child pornography charges fails to demonstrate that he ever had possession of child pornography and that these charges constituted a multiplicity violation. We disagree and affirm the judgment of the trial court.

## FACTS

¶ 2. The facts are largely undisputed. The victim, A.J., took a job at Lindgren's store in October 2001, when she was fourteen years old. A.J. did not fill out a job application, and Lindgren paid her in cash. In December, at a casual party at the business, Lindgren allowed A.J. to consume alcohol. She had worn a shirt and skirt that day, but had changed into her uniform for work. Lindgren told A.J. that he wanted a picture of her

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

in her skirt. A.J. went to change her outfit in a bathroom. Lindgren followed her and took a Polaroid picture of her in her bra and underpants. He took a second picture of her in her shirt and skirt.

¶ 3. In January 2002, A.J.'s boyfriend began to call and visit her at work. Lindgren asked her about this and she explained that she was not allowed to use the phone to call her boyfriend from her foster home. A.J. indicated that Lindgren agreed to let her call her boyfriend from Lindgren's cell phone if he could take more photographs of her. She agreed.

¶ 4. Between January 2002 and March 9, 2002, there were three or four more photo sessions during which Lindgren would touch A.J. on her breasts, legs, and bottom. He also gave her cash, between $5 and $50, when he took pictures of her. On March 9, 2002, Lindgren took two nude photographs of A.J. and touched her vaginal area. She got dressed, left, and did not return to work for Lindgren.

¶ 5. A.J. reported the events to her foster mother, who took A.J. to the City of Kenosha Police Department on March 18, 2002. On March 19, A.J. telephoned Lindgren from the police department. Detective Ruben Silguero taped the conversation, which included the following exchange:

Lindgren: What's up?

A.J.: I was just wondering. Ah, God, umm, you said you destroyed all the pictures of me, right?

Lindgren: Yeah, you seen me throw them out.

A.J.: Yeah, but I didn't see you throw them ALL out.

Lindgren: Yeah, you did.

A.J.: No, 'cause remember one time we were in a rush, and you left 'em there, and I was just making sure you destroyed all of my naked pictures of me.

Lindgren: No, I never took 'em home. I cut 'em up. They're in the dumpster.

A.J.: They're in the dumpster.

Lindgren: The other ones, I burnt 'em. Why?

. . . .

A.J.: Okay. Well, all—all the pictures of me, my (inaudible) underwear, one's the nude—nude are all done. They're thrown away, burned whatever you did with . them, right.

Lindgren: Yes, you saw me. I burnt 'em. They were burnt right in front of you. The one was burnt, and the other one I cut up in front of you. That's why I did it in front of you, so you don't think that—

A.J.: No, no, no, you didn't do 'em all.

Lindgren: Oh, those other ones. No, I left here and I did the next day. And those aren't nude anyway, there [sic] just your underwear, bra.

. . . .

A.J.: How many did we take?

Lindgren: I don't know. (Pause) I don't remember. (laughed) Been a few. I never took 'em home though. The only ones I took home was [sic] those ones I brought back—

¶ 6. Detective Silguero later interviewed Lindgren about A.J.'s allegations. During the interview Lindgren admitted that he thought A.J. was fifteen

857

years old and that he had taken photographs of A.J., but he insisted that she was fully clothed in the photographs. After Silguero told Lindgren that he had listened to the phone conversation with A.J., Lindgren supplemented his statement. This time he indicated that A.J. would "flash" him by lifting her shirt to expose her bra and opening her pants to expose her underwear, which Lindgren described as "thong-type" underwear. He continued to deny taking any nude photographs of A.J., but stated "what can I do when I had a camera in my hand, I took the pictures of her flashing me."

¶ 7. After the interview, Silguero asked Lindgren for permission to search his business and his home. Lindgren said no. Silguero indicated he would draw up a search warrant and Lindgren then turned over keys to both locations in order to avoid any damage when the police entered the property. Detective Robert Queen was assigned to assist Silguero with the search warrants.

¶ 8. The detectives prepared an affidavit for a search warrant for Lindgren's home, car, and business. A Kenosha county court commissioner signed the warrant authorizing the searches.

¶ 9. Queen and Silguero found three guns, a Polaroid camera and film, and large amounts of cash at Lindgren's business. At his residence, they discovered a nursery for marijuana plant seedlings, several mature marijuana plants, marijuana that had been harvested and dried, a scale, pornographic magazines and tapes, several guns, and approximately $13,000 in cash. They also confiscated Lindgren's home computer system.

¶ 10. The State charged Lindgren with child enticement, second-degree sexual assault of a child under sixteen years of age, and manufacturing-delivering THC.

¶ 11. Police computer expert Ric Bentz, in collaboration with FBI Agent Matthew Petersen, examined Lindgren's computer. They determined that pornographic photographs were on the hard drive, including photographs from child pornographic sites. The State filed a second complaint, charging Lindgren with six counts of possession of child pornography.

¶ 12. Lindgren moved to suppress all evidence seized in the searches based on insufficiency of the affidavit supporting the search warrant. The trial court denied the motion, finding that the magistrate could have reasonably found that the objects sought were linked to a crime and that the objects would be found in the place to be searched, that is, the home.

¶ 13. Lindgren pled no contest to one count of child enticement and one count of manufacturing-delivering THC. The second-degree sexual assault of a child charge was dismissed. Following a bench trial, the court found Lindgren guilty of five counts of possession of child pornography. Lindgren appeals, asking this court to set aside all convictions.

## DISCUSSION

¶ 14. Lindgren presents three issues on appeal. First, he contends that the search of his home lacked probable cause because there was an insufficient nexus between the conduct complained of and the location searched. Next, he argues that the evidence presented at trial was insufficient to support a charge of possession of child pornography. Finally, Lindgren raises a multiplicity violation. We take these issues in the order presented.

¶ 15. Lindgren argues that Silguero's affidavit did not demonstrate probable cause for searching his home because all of the conduct complained of occurred at his business. Specifically, he asserts that Silguero did not present any grounds for believing that a crime was committed at Lindgren's residence, and further, he challenges the sufficiency of Attachment B, a profile of preferential child molesters, as the justification for the search of his home. We give great deference to a magistrate's determination that probable cause supports issuing a search warrant. *State v. Ward*, 2000 WI 3, ¶ 21, 231 Wis. 2d 723, 604 N.W.2d 517. This deferential standard of review "further[s] the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *State v. Schaefer*, 2003 WI App 164, ¶ 4, 266 Wis. 2d 719, 668 N.W.2d 760 (citation omitted), *review denied,* 2003 WI 140, 266 Wis. 2d 61, 671 N.W.2d 848 (Wis. Oct. 1, 2003) (No. 01–2691–CR).

¶ 16. When reviewing the validity of a search warrant, we are limited to the record that was before the issuing magistrate. *Id.*, ¶ 6. Accordingly, we confine our review to Silguero's affidavit, which describes A.J.'s allegations and the taped telephone conversation, and incorporates by reference Attachment B.

¶ 17. Silguero's affidavit stated an expectation that the detectives would find "photographic material of underage children of sexually explicit nature, a computer with associated devices for storage and duplication of photographic material, and items listed on attachment B." He provided factual grounds for issuing the warrant, stating that A.J.'s statement alleged that

Lindgren had taken "photographs of her nude" and that "he touched her vaginal area while she was naked." A.J. also stated that Lindgren told her that he had taken photographs of other female employees. In the taped telephone conversation, Silguero heard Lindgren admit to taking nude photographs of A.J. The affidavit contained all of this information and stated that the actions complained of took place at Lindgren's place of business.

¶ 18. In addition to A.J.'s allegations and the telephone conversation, Silguero's affidavit incorporated by reference Attachment B, entitled "Preferential Child Molester Information," which listed common habits and characteristics of child molesters. Specifically, the preferential child molester profile asserted that the affiant, here Silguero, learned through training, experience, and consultations with experts that preferential child molesters collect sexually explicit materials such as photographs or videotapes, rarely dispose of these materials, often use instant photograph equipment such as Polaroid cameras, go to great lengths to conceal and protect the illicit materials, and maintain diaries of their encounters in notebooks, on audio tape, or on their home computers.

¶ 19. Upon reviewing Silguero's application for a search warrant, the court commissioner was to make a "practical, common sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *See id.*, ¶ 4 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). We must consider whether, when objectively viewed, the information before the magistrate provided "sufficient facts to excite an honest belief in a reasonable mind

861

that the objects sought are linked with the commission of a crime, and that they will be found in the place to be searched." *State v. Marquardt*, 2001 WI App 219, ¶ 13, 247 Wis. 2d 765, 635 N.W.2d 188. We conclude that Silguero did indeed provide sufficient facts to the court commissioner.

¶ 20. The quantum of evidence required to establish probable cause to issue a search warrant is less than that needed to bind over for trial at a preliminary hearing. *State v. Higginbotham*, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991). "Probable cause is not a technical, legalistic concept but a flexible, common-sense measure of the plausibility of particular conclusions about human behavior." *Id.* (citation omitted). Here, Silguero placed a plausible scenario, based on facts and experience, before the court. He alleged that the search warrant was intended to uncover evidence related to the crime of sexual exploitation of a child, that the search would uncover items specifically referenced by the victim, and that it was reasonable to expect that the perpetrator of this sort of crime would go to great lengths to conceal the objects and may have kept a record of the illegal activity on a home computer. We agree with Lindgren that Silguero could have presented a more complete foundation for the search of Lindgren's residence. For example, the transcript of the telephone conversation reveals that when pressed about the photographs, Lindgren stated, "The only ones I took home was [sic] those ones I brought back." Had Silguero specifically referenced this statement in the affidavit, the search warrant would have been less vulnerable to Lindgren's attack. It is the established policy of our appellate courts, however, that marginal cases regarding a warrant-issuing magistrate's determination of

probable cause should be largely determined by the strong preference that officers conduct their searches pursuant to a warrant. *Id.* at 990. We hold that the court commissioner in issuing the search warrant made a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit before him, there was a fair probability that contraband or evidence of a crime would be found at Lindgren's residence. *See Schaefer*, 266 Wis. 2d 719, ¶ 4.

*Sufficiency of the Evidence for*
*Possession of Child Pornography*

¶ 21. Following a bench trial, Lindgren was convicted on five of six counts of possession of child pornography. At trial, the State presented evidence obtained from Lindgren's home computer. Through its computer experts, Bentz and Petersen, the State introduced eleven exhibits, specifically, five thumbnail images and six other images that had been electronically opened to enlarge the pictures. At trial, Petersen testified that in order for the photographs found on Lindgren's hard drive to be stored as they were, the person would have had to go to the Web site and click on the small thumbnail pictures to enlarge the images. Upon clicking to enlarge the image, it would be stored on the hard drive. Petersen opined that clicking on the thumbnail pictures to bring up larger images reflected an attempt to "control or manipulate" the images.

¶ 22. Lindgren challenges the court's finding that he "possessed" child pornography as that term is used in Wis. Stat. § 948.12(1m), which states in relevant part:

 **(1m)** Whoever possesses any undeveloped film, photographic negative, photograph, motion picture,

videotape, or other recording of a child engaged in sexually explicit conduct under all of the following circumstances is guilty of a Class I felony:

(a) The person knows that he or she possesses the material.

(b) The person knows the character and content of the sexually explicit conduct in the material.

(c) The person knows or reasonably should know that the child engaged in sexually explicit conduct has not attained the age of 18 years.

¶ 23. Lindgren asserts that the images recovered from his personal computer were never in his possession. He relies on his own expert, Steven Greenfield of SMG Computing, Inc., who testified that no evidence of any child pornography had been saved on Lindgren's computer. Lindgren also raises the issue of "pop-up" ads that will appear when a computer user is on the Internet and may result in unintended or undesired information on any computer. In sum, Lindgren contends that the evidence presented was insufficient to support the court's finding of possession, a required element of the crime.

■

¶ 24. The burden of proof is on the State to prove every essential element of the crime charged beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). The test is not whether this court is convinced of the defendant's guilt, but whether we can conclude that the trier of fact could, acting reasonably, be so convinced by the evidence. *Id*. at 503–04. When reviewing the evidence to challenge a finding of fact, we view it in the light most favorable to the finding. *Id*. at 504. Under this standard, a reviewing

court may overturn a verdict on grounds of insufficiency of the evidence only if the trier of fact could not possibly have drawn the appropriate inferences from the evidence adduced at trial. *State v. Watkins*, 2002 WI 101, ¶ 68, 255 Wis. 2d 265, 647 N.W.2d 244.

¶ 25. Lindgren's challenge to the concept of possession in the context of computer material has been recently, though not widely, addressed. We take guidance from a federal case where facts and issues reasonably analogous to those here were considered. In *United States v. Tucker*, 305 F.3d 1193 (10th Cir. 2002), *cert. denied,* 537 U.S. 1223 (2003), Tucker argued that because the child pornography images were only temporarily displayed on his computer screen and he did not desire the images to be saved on his hard drive, he was not guilty of possession of the images. *Id.* at 1204. Tucker argued that a computer will automatically save thumbnail pictures to the temporary Internet cache file and that this involuntary process should not be held against the computer user. *Id.* at 1205.

¶ 26. The *Tucker* court was not persuaded, finding that Tucker had control over the files present in his Web browser cache file. *Id.* at 1204. At the trial, the government's computer expert testified that an image in a cache file can be attached to an e-mail, posted to a newsgroup, placed on a Web site, or printed to a hard copy. *Id.* The court held:

> Tucker . . . intentionally sought out and viewed child pornography knowing that the images would be saved on his computer. Tucker may have wished that his Web browser did not automatically cache viewed images on his computer's hard drive, but he concedes he knew the Web browser was doing so. Tucker continued to view child pornography knowing that the pornography was being saved, if only temporarily, on his computer. In

865

> such circumstances, his possession was voluntary. Since he knew his browser cached the image files, each time he intentionally sought out and viewed child pornography with his Web browser he knowingly acquired and possessed the images.

*Id.* at 1205 (footnote omitted).

¶ 27. We adopt the *Tucker* court's reasoning. Here, the State's experts testified that Lindgren had visited teen sex Web sites, that five images showed up twice on Lindgren's computer hard drive (once as a thumbnail and once as a larger image), that for images to be saved on Lindgren's hard drive he would have had to click on and enlarge the thumbnail images, and that the only way an image would have been stored on the hard drive was if the computer user tried to save or otherwise manipulate the image by clicking on it. Further, Petersen testified that one of the images was saved to "My Documents" in the "Jack Lindgren" folder, but the others were not because the new operating system overwrote the old one.[2] Although Lindgren attempts to paint himself as the victim of computer viruses and unwanted "pop-up" ads, there is sufficient evidence in the record to demonstrate that he knowingly possessed the child pornography images on his computer because he repeatedly visited child pornography Web sites, clicked on thumbnail images to create larger pictures for viewing, accessed five images twice, and saved at least one image to his personal folder. We conclude that the trial court as finder of fact could, acting reasonably, have been convinced by the evidence

---

[2] In March 2002, Albert Thumler, III, an acquaintance of Lindgren's, helped Lindgren upgrade his system from Windows Millennium to Windows XP. The upgrade was performed just days before the police seized the computer.

that Lindgren possessed the child pornography. *See Poellinger*, 153 Wis. 2d at 504.

*Multiplicity*

¶ 28. Lindgren's final claim of error rests on the multiple possession charges for which he stands convicted. Lindgren does not argue the multiplicity issue in his brief-in-chief and cannot save it in his reply brief. Lindgren attempts to recast the purpose of the reply brief as one that can respond to any issue raised by the respondent in the response brief. In other words, Lindgren asserts that because the State's response brief noted that he had waived the issue of multiplicity, he is now free to argue it in his reply brief. That is not the law. If an appellant fails to discuss an alleged error in his or her main brief, the appellant may not do so in the reply brief. *See Marquardt*, 247 Wis. 2d 765, ¶ 14 n.3. We may decline to review an issue inadequately briefed and deem this issue waived. *See Roehl v. Am. Family Mut. Ins. Co.*, 222 Wis. 2d 136, 149, 585 N.W.2d 893 (Ct. App. 1998).

## CONCLUSION

¶ 29. We hold that the court commissioner in issuing the search warrant made a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, there was a fair probability that contraband or evidence of a crime would be found at Lindgren's residence. *See Schaefer,* 266 Wis. 2d 719, ¶ 4. We further hold that the facts presented at trial support the court's finding of "possession" within the meaning of WIS. STAT. § 948.12(1m), and conclude that the convictions for five counts of

possession of child pornography are supported by suffi-
cient evidence. We decline to review the multiplicity
challenge because Lindgren has waived the issue.

*By the Court.*—Judgment affirmed.

¶ 30. ANDERSON, P.J. (*dissenting*). I respectfully
dissent from that portion of the majority opinion hold-
ing that the search warrant for Lindgren's home was
supported by probable cause. I cannot join in the
conclusion that Detective Ruben Silguero's affidavit
and Attachment B, titled "Preferential Child Molester
Information" pass muster. I part company with the
majority because there is nothing in the record that
tells me why the issuing magistrate should have relied
upon Silguero's experience and special knowledge.

¶ 31. In Wisconsin, a warrant-issuing magistrate
may rely upon the experience and special knowledge of
the police officer applying for a search warrant. *State v.
Harris*, 256 Wis. 93, 100, 39 N.W.2d 912 (1949). Two
recent decisions demonstrate what is needed to estab-
lish the experience and special knowledge of the officer.
First, in *State v. Multaler* (*Multaler II*), 2002 WI 35, 252
Wis. 2d 54, 643 N.W.2d 437, there was a challenge to the
sufficiency of the affidavit accompanying the applica-
tion for a search warrant. Multaler was the suspect in
the disappearance and murder of four young women in
1974 and 1975; it was not until 1998 that the police
were able to apply for a search warrant for Multaler's
residence. *Id.*, ¶ 3. The core of the affidavit submitted
in support of a request for a search warrant was that
the applying officer and another detective were inves-
tigating the disappearance and murder of four young
women and not only was Multaler the prime suspect

but also was a serial killer as evidenced by his behavior
that was consistent with that expected of serial homi-

cide offenders; as serial killers are wont to do, he collected and retained various mementos to remind him of the murders, including items taken from the victims; although it was more than 20 years since the time of the murders, these items were likely to be found in his house because serial killers retain such items indefinitely.

*Id.*, ¶ 9. The affidavit being reviewed by the supreme court in *Multaler II*, painstakingly details the pertinent facts the investigating officer had accumulated, the officer's experience and training, and only then does the affidavit begin to meticulously match pieces of evidence to the characteristics of serial homicide offenders. Appendix for Appellant at 14–30, *State v. Multaler* (*Multaler I*), 2001 WI App 149, 246 Wis. 2d 752, 632 N.W.2d 89 (No. 00–1846–CR).

¶ 32. Multaler directly challenged reliance upon the investigator's opinion that he was a serial killer, asserting that the detective had no personal experience investigating serial killers, and he did not cite the sources upon which he based his opinion. The supreme court rejected Multaler's argument:

> The affidavit shows that Investigator Hanrahan exhaustively researched and studied the patterns of serial homicide offenders. His statements regarding the typical characteristics of serial killers were based upon a number of expert sources, for which he supplied names, authors, and credentials. In addition, Hanrahan stated in the affidavit that he attended various training courses or symposia on the subject of serial killers, some of which were taught by the experts who had written materials Hanrahan studied.

> There can be no question that Investigator Hanrahan possessed specialized knowledge pertaining to traits common to serial killers based on his extensive

study of the topic. His lack of previous field experience investigating serial homicide is not a bar to his qualifications to give opinions about the behavior of serial killers for purposes of a warrant.

*Multaler II*, 252 Wis. 2d 54, ¶¶ 44–45.[1]

[1] The investigating detective's affidavit was lengthy and devoted several paragraphs to his experience and training:

> Your affiant states that he has read, studied and researched numerous books, texts and articles on the subject of Serial Homicide.

> Your affiant states that he has attended a number of training courses and symposiums relative to Criminal Profiling and Serial Homicide.

> Your affiant states that he has read four books on the topic of Serial/Sexual Homicide authored by John Douglas, Ph.D. Mr. Douglas is a retired Supervisory Special Agent for the Federal Bureau of Investigation, and the former Head of the FBI's Behavioral Science Unit in Quantico, VA.

> Your affiant states that he has read two books on Serial Homicide and Signature Killers authored by Robert D. Keppel, Ph.D. Mr. Keppel is currently the Chief Criminal Investigator for the Washington State Attorney General's Office and was formerly a Detective with the King County (WA) Sheriff's Office. Mr. Keppel was the Lead Investigator in the investigation of the numerous serial homicides committed in King County Washington by Ted Bundy. Mr. Keppel was also the Lead Investigator in the investigation of numerous serial homicides in King County Washington called the Green River Murders, where there are at least 49 victims. Mr. Keppel was also called in as a consultant for the Atlanta Child Murders.

> Your affiant states that he has read three books on Serial Homicide authored by Robert K. Ressler. Mr. Ressler is a retired Special Agent for the FBI, also having been assigned to the FBI Behavioral Science Unit in Quantico, VA.

> Your affiant states that he has read the text Practical Homicide Investigation authored by Vernon J. Geberth, a retired Lieutenant Commander with the New York City Police Department Homicide Division.

¶ 33. The second case is *State v. Schaefer*, 2003 WI App 164, 266 Wis. 2d 719, 668 N.W.2d 760, *review denied*, 2003 WI 140, 266 Wis. 2d 61, 671 N.W.2d 848 (Wis. Oct. 1, 2003). At issue in *Schaefer* was the sufficiency of the probable cause supporting a search warrant for Schaefer's residence, issued upon the affidavit of Special Agent Michael J. Vendola, of the Division of Criminal Investigation of the State's Department of Justice. A very lengthy affidavit described in thorough detail evidence law enforcement had gathered from interviews and searches of other locations. *See id.*, ¶¶ 8–13. The affidavit incorporated a document labeled Attachment A, entitled "Michael J. Vendola Qualifications as of 07/01/98"[2] and a document labeled Attach-

---

Your affiant states that he has attended two multiple day training courses on Criminal Profiling and Criminal Investigative Analysis, both with regard to Serial Homicide. The courses were from the FBI and taught by Neil Purtell, a Special Agent with the Federal Bureau of Investigation in Madison, Wisconsin.

Your affiant states that in April of 1998, he attended a three day Homicide symposium in Green Bay, Wisconsin. The symposium was put on by the Wisconsin Association of Homicide Investigators, of which your affiant is a member.

Lecturers for that symposium were the aforementioned John Douglas, Ph.D., and Robert Keppel, Ph.D. Messrs. Douglas and Keppel covered at length, all aspects of Serial Homicide and Signature Killers.

Appendix for Appellant at 26–27, *State v. Multaler (Multaler I)*, 2001 WI App 149, 246 Wis. 2d 752, 632 N.W.2d 89 (No. 00–1846–CR).

[2] Attachment A is properly characterized as a resume and includes the following information:

Received Bachelor of Arts Degree, University of Illinois, Psychology Major;

Police Officer since 1969;

ment B, without a title, that is a two-page document
containing eighteen characteristics of preferential child

Hired by Wisconsin Department of Justice on 05/05/72 and certified as police officer since 1972;

Investigated child pornography and child molestation since 1984;

Has focused on preferential child molesters;

Has authored five articles; "Use Of Wisconsin Statutes as an Aid in the Investigation of Child Sexual Assault," "Use of Wisconsin Statutes as an Aid in Investigation of Child Abuse," "Child Pornography and Sexual Exploitation," "Covert Phone Calls Using Juveniles," and "Validation of Child Sexual Abuse";

Has developed sexually exploited child offender (SECO) format for classifying offenders;

Has examined hundreds of nude/sexually explicit visual depictions of juveniles;

Has interviewed scores of juvenile sexual assault victims;

Has received awards from the United States Customs Service for participating in a 1985 child pornography importation case; the Winnebago County District Attorney's office in a 1994 investigation, arrest and conviction of a preferential child molester; the Outagamie County District Attorney's office in a 1994 investigation, arrest and conviction of a serial murderer whose victims included two juveniles;

Has submitted examples of child pornography and child erotica, in 1986, to the Midwest Regional Meeting of the Attorney General's Commission on Pornography;

Has interviewed or had covert contact with numerous convicted child molesters, and has read scores of correspondence sent to and from preferential child molesters;

Has assisted in preparing 26 search warrants whose basis, in part, relied on preferential child molester traits—not one search warrant has been suppressed and all defendants have been convicted of criminal charges, with one exception, and one Lafayette County case is charged and pending;

Has assisted in approximately 74 child pornography/child sexual assault investigations;

872

molesters.[3] *See id.*, ¶ 6. Similar to the affidavit in *Multaler I* and *II*, the affidavit in *Schaefer* methodically matches the detailed evidence with the characteristics of preferential child molesters to support the affiant's conclusion that Schaefer is a preferential child molester. Appendix for Appellant at 128–30, *Schaefer*, 266 Wis. 2d 719. Citing from *Multaler II*, 252 Wis. 2d 54, ¶ 34, that "every probable cause determination must be made on a case-by-case basis, looking at the totality of the circumstances," we rejected Schaefer's challenge to the search warrant. *Schaefer*, 266 Wis. 2d 719, ¶¶ 17, 29.

Has provided consultation to local law enforcement agencies on approximately 62 additional cases;

Member of American Professional Society on the Abuse of Children (APSAC);

Has provided instruction to law enforcement officers, probation and parole officers, juvenile intake officers, and prosecutors, totaling approximately 257 hours and over 2065 students;

Has consulted regularly with law enforcement officers across the United States who investigate child sexual assault/exploitation;

Has read numerous articles, publications and books from noted authorities in the fields of child abuse and sexual abuse;

From 1982 through 07/01/98, has received approximately 236 hours of training relating to child sexual abuse/exploitation and child abuse.

Appendix for Appellant at 133, *State v. Schaefer*, 2003 WI App 164, 266 Wis. 2d 719, 668 N.W.2d 760 (No. 01–2691–CR).

[3] I have carefully examined Attachment B from the affidavit in support of the application for a search warrant in this case and Attachment B from *Schaefer*: There is no substantive difference between the two, the only reasonable inference is that Attachment B in this case is an exact copy of Attachment B in *Schaefer*. Appendix for Appellant at 134–35, *Schaefer*, 266 Wis. 2d 719.

¶ 34. Silguero's two-and-one-half page affidavit in this case lacks any information detailing his experience and specialized training. While his affidavit incorporates the same Attachment B from *Schaefer* with the same introductory phrase, "[f]rom affiant's training, experience, and consultations with professionals dealing with preferential child molesters, affiant has learned that," it does not provide the magistrate with the experience and special knowledge of Silguero. In *Multaler I* and *II* and *Schaefer*, the affidavits carefully set forth the evidence that has been gathered, thoroughly describe the police officer's extensive experience and training; and, after establishing a solid foundation, the affidavits systematically offer the affiant's opinion why a piece of evidence is consistent with the characteristics of either a serial homicide offender or a preferential child molester. Unfortunately, in this case, the affidavit has only two paragraphs of evidence that has been gathered by Silguero; it does not establish his credentials, and it does not offer his opinion of why the evidence establishes that Lindgren is a preferential child molester.

¶ 35. I recognize that the application for a search warrant is not a research paper in which each fact and conclusion must be extensively annotated. *Multaler II*, 252 Wis. 2d 54, ¶ 47. Nevertheless, the affidavit must provide a substantial basis to support the conclusion that probable cause existed. *State v. Higginbotham*, 162 Wis. 2d 978, 988–89, 471 N.W.2d 24 (1991). The warrant-issuing magistrate cannot go outside of the application for a search warrant to find probable cause but must limit review to the *facts* presented. *See State v. Ward*, 2000 WI 3, ¶ 26, 231 Wis. 2d 723, 604 N.W.2d 517. Similarly, the warrant-issuing magistrate cannot base a finding of probable cause upon suspicions and

conclusions in the application for a search warrant. *Id.*, ¶ 28; *Higginbotham*, 162 Wis. 2d at 992. The failure to provide Silguero's experience and special knowledge and to use his background to match the evidence gathered to the characteristics of preferential child molesters leads to the result the supreme court warned about in *Multaler II*:

> [W]e agree with the analysis the State gives in its brief:
>
>> The affidavit might have been flawed as conclusory if Hanrahan had merely asserted the general proposition that he was qualified to offer information about serial killers. That is not what Hanrahan did. He identified the authority underlying his statements, and established that his reliance on the sources was reasonable.

*Multaler II*, 252 Wis. 2d 54, ¶ 48.

¶ 36.　Silguero's affidavit is fatally flawed. He generally asserts that because of his training, experience and consultations with professionals, he is qualified to describe the eighteen characteristics of preferential child molesters and to conclude that based upon his investigation, Lindgren is a preferential child molester. Silguero fails to identify his training, experience and the professionals he has consulted; he fails to establish any support for his statements; and he fails to establish that his reliance on his sources was reasonable. Therefore, the affidavit and Attachment B consist only of eighteen conclusory statements and unspoken suspicions that Lindgren's behavior is consistent with the behavior of preferential child molesters. Consequently, I conclude that the application for a search warrant lacks a substantial basis to support a finding of probable cause.

¶ 37. While I would reverse the circuit court's finding that there was probable cause to support the search warrant of Lindgren's home, I would not suppress the evidence seized during the search. Because our supreme court has adopted the good faith exception to the exclusionary rule, *State v. Eason*, 2001 WI 98, ¶ 74, 245 Wis. 2d 206, 629 N.W.2d 625, I would remand for a determination of Silguero's experience and specialized knowledge, whether it supports his assertion that Attachment B accurately describes the characteristics of a preferential child molester and whether under the totality of the circumstances it is reasonable for Silguero to conclude that evidence he has gathered permits the conclusion that Lindgren is a preferential child molester.