STATE of Wisconsin, Plaintiff-Respondent,

v.

Sheldon C. STANK, Defendant-Appellant.†

Court of Appeals

*No. 2004AP1162–CR. Submitted on briefs September 14, 2005.
—Decided October 26, 2005.*

2005 WI App 236

(Also reported in 708 N.W.2d 43.)

† Petition to review dismissed 11-28-05.

414

415

417

On behalf of the defendant-appellant, the cause was submitted on the brief of *Dennis P. Coffey* of *Mawicke & Goisman, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Stephen W. Kleinmaier*, assistant attorney general.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. BROWN, J. Sheldon C. Stank appeals from judgments of conviction and an order denying his motion for postconviction relief. He raises a variety of contentions. He first claims that the physical evidence seized during a search warrant should have been suppressed because the witness who testified against him at the warrant application hearing was biased against him and possessed information too stale to support probable cause. Stank also claims that the court plainly erred by allowing the State to present bad character evidence in the form of weapons and publications. Finally, he states that the trial evidence did not support two elements of the count charging him with possession with intent to deliver Oxycontin while armed. He insists that no evidence exists to support such an intent to distribute the Oxycontin and that the forensic scientist's failure to test both samples of suspected Oxycontin made it impossible for the jury to determine the identity of the drug recovered. We disagree with all of these contentions and affirm. The court issuing the warrant found the witness credible and that his knowledge of ongoing large-scale drug trafficking supported a present finding of probable cause. Moreover, the weapons and reading material were highly relevant for reasons other than casting Stank in a bad light, such that any error in admitting the evidence is not obvious. Finally, we determine that the record supports the possession with intent to deliver charge. The jury had enough evidence to determine the identity of the Oxy-

419

contin from two experts' use of the *Physician's Desk Reference* as a presumptive, pharmaceutical identification, subsequent confirmatory testing of a pill in one of the samples, and other circumstantial evidence. We also find ample circumstantial evidence of intent to deliver the Oxycontin.

¶ 2. John Oehler and Stank met eleven or twelve years ago, and the two men became personal friends roughly four years ago. Oehler would see Stank on a weekly basis. In addition to being Oehler's friend, Stank also became a regular supplier of marijuana for Oehler.[1] Oehler kept a ledger of his weekly purchases, which recorded transactions spanning from January to November of 2001. Often, Oehler would make his purchases at Stank's residence.

¶ 3. On November 14, the Milwaukee Police Department received an anonymous complaint. The complaint implicated Stank in possible drug trafficking, so an officer went to Stank's house to follow up. When nobody answered the door, the police left and apparently did not attempt to investigate further.

¶ 4. Some time in the fall of 2001, Stank invited Oehler to help him with a roofing job in Racine county, and Oehler accepted. The two men eventually had a falling out because of a dispute over whether Stank had fully paid Oehler for his assistance. Oehler began leaving numerous voice mail messages for Stank, some of them threatening.

¶ 5. The bad blood between the two men led to two police complaints against Oehler. First, Stank called the Milwaukee Police Department and reported a

---

[1] The record is clear that Oehler had purchased marijuana from Stank intermittently before 2001 but contains inconsistent information on when those occasional purchases started.

burglary of his home. This call prompted a detective to go out to Fond du Lac to question Oehler, which further angered Oehler. The second complaint, which the department received on December 14, regarded the harassing phone calls. This complaint ultimately led to Oehler's arrest later that day for unlawful use of a telephone.

¶ 6. Following the arrest, Oehler spoke with Detective Heck. Oehler brought up at that meeting the subject of Stank's drug trafficking. Detective Heck advised Oehler to contact Detective Glidewell on the department's vice squad about the matter and gave him a phone number to call. On January 6, Oehler did call the detective, and the two arranged to meet in person the following day. At that meeting, Oehler told Detective Glidewell about Stank's illicit activities and showed the detective his ledger of purchases. The following day, Detective Glidewell sought a search warrant and brought Oehler to court to testify about his knowledge of Stank's illegal activity.

¶ 7. At the warrant application proceeding, Oehler testified as follows: (1) he had been buying marijuana from Stank for ten to eleven years; (2) he had been to Stank's residence over five hundred times and purchased approximately $50 of marijuana from Stank on a weekly basis; (3) Stank kept the marijuana in the freezer compartment of a kitchen refrigerator and in an old garage freezer bound shut with bungie cords; (4) every time he went to the residence, he would see the same group of people there to buy drugs; (5) he had seen a firearm Stank kept at the house; and (6) he was upset with Stank over the payment dispute and for falsely accusing him of stealing his drugs and reporting him for the burglary and harassing phone calls. His anger prompted him to contact Detective Glidewell to report

421

the drug activity. He admitted that the State had granted him use immunity in return for his testimony at the warrant application hearing.

¶ 8. Detective Glidewell also testified. He verified that he had seen Oehler's ledger of purchases and further mentioned the November 14 anonymous complaint he received. Additionally, he testified that in his experience, someone trafficking in controlled substances like marijuana for at least four-and-one-half to five years does not suddenly shut down operations.

¶ 9. The court granted the State's request for a warrant, and several members of the department's vice squad executed the warrant. The search turned up several drugs, weapons, and drug paraphernalia, including approximately three pounds of marijuana, Oxycontin, two marijuana pipes, grow lights, a scale, and eighteen firearms. Along with the guns, the police recovered ammunition, a flash suppressor for a gun, and a bulletproof vest. They also found several books on munitions. The titles of these books included, among others, (1) *The Department of the Army Field Manual, Explosives and Demolitions;* (2) *A Full Auto Modification Manual,* (3) *Home Workshop Silencers;* (4) *The Anarchist's Black Book of Improvised Munitions;* (5) *Secret to Component High Explosive Mixtures and Improvised Shape Charges, Semi-Auto MAC-10 Modification Manual;* and (6) *How to Make Disposable Silencers, Complete Guide.* The search also uncovered a *High Times* magazine.

¶ 10. Detective Glidewell uncovered the Oxycontin. While searching the upstairs, which Stank used as a bedroom, Detective Glidewell eventually noticed a black garbage can at the top of the stairs. When he looked inside the can, instead of seeing refuse, he found a paper grocery bag. He opened the bag to ascertain its

contents and found some freezer Ziplock bags of different sizes containing marijuana. It also contained a loaded pistol and an unmarked prescription-style bottle of pills. The bottle contained thirty-seven pills, all of which were green, white, or yellow and had "OC" stamped on one side. The other side of each contained a number. The six green pills contained the number eighty, the twenty-nine yellow ones were marked with the number forty, and the two white pills had the number ten. All of them had a coating and an absence of scoring. Detective Glidewell testified that he identified these pills as Oxycontin pills of different milligrams.

¶ 11. After he discovered the bottle of Oxycontin, Detective Glidewell searched Stank's bedroom closet. There he found two marijuana pipes, an SKS rifle, a Winchester rifle, a Mac-11 handgun, and another bag with pills in the general vicinity of a yellow envelope containing seven hundred-dollar bills. The bag contained twenty green pills identical in appearance to the green pills in the prescription bottle.

¶ 12. At some point during the execution of the search warrant, Stank arrived at the residence. Detective Glidewell searched him and recovered a bag of marijuana. The detective then placed Stank under arrest.

¶ 13. Following the search, Detective Glidewell sent the suspected marijuana and Oxycontin evidence to Detective Davila for testing and inventory. The former tested positive for THC. Detective Davila did not have the equipment necessary to test pills, but she identified both samples as Oxycontin based on her comparison of the pills to the *Physician's Desk Reference,* which contains pictures and descriptions of different drugs.

¶ 14. The pills were then sent to the state crime laboratory for testing. The forensic scientist compared the twenty green pills from the closet to the *Physician's Desk Reference*. Based on the coatings, coloring, shape, and characteristic markings on the pills, she identified them as Oxycodone of the Oxycontin brand name. She also crushed one of the pills and subjected it to two scientific tests. Both tests confirmed her visual identification. The forensic scientist also examined the pills from the bottle recovered from the garbage can. She compared the green pills to the other twenty green pills and concluded they were the same. She did not, however, conduct scientific tests on the pills from the garbage can.

¶ 15. On January 11, 2002, the State charged Stank with possession with intent to deliver more than 500 but not more than 2500 grams of the controlled substance tetrahydrocannabinols (marijuana), contrary to Wis. Stat. §§ 961.41(1m)(h)2., 961.01(14), and 961.14(4)(t) (2001–02)[2]. The criminal complaint also charged Stank with possession with the intent to deliver the controlled substance Oxycodone, a schedule II narcotic, a violation of Wis. Stat. §§ 961.16(2)(a)11. and 961.41(1m)(a). The State filed an information on January 22 with the same charges.

¶ 16. On March 18, Stank moved to suppress the fruits of the search on the basis that the information on which the warrant was predicated was stale and unreliable. The parties appeared at a motion hearing on May 28. Stank requested an adjournment, however, because he had not been able to procure Oehler as a witness,

---

[2] Please refer to language effective prior to February 1, 2003. All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

and Stank believed Oehler's testimony was essential to support his claim that the warrant-issuing judge was not fully and accurately apprised of the relevant facts and the relationship between Stank and Oehler. The court denied the motion on June 7 and scheduled a trial date.

¶ 17. Prior to trial, the parties attempted to negotiate an acceptable plea agreement. Stank, however, did not accept the plea offer. As a result, the State amended its original information to include two new counts. Count three charged Stank with failure to pay the controlled substance tax on his marijuana, in violation of Wis. Stat. §§ 139.87(2), 139.88(1), 139.89, 139.95(2), 961.01(14), and 961.14(4)(t). Count four was for keeping a drug house (manufacturing, keeping or delivering controlled substances) while armed, contrary to Wis. Stat. §§ 961.42(1) and 939.63. The amended information also added "while armed" enhancers to counts one and two.

¶ 18. Voir dire commenced on October 9. During the prosecutor's questioning of the prospective jurors, he asked:

> Along with controlled substances generating strong feelings in some people, guns also generate strong feelings in all sorts of people. There [is] literally going to be a shopping cart full of guns in this case. 18 different handguns, rifles and shotguns were seized at the defendant's home. Does anybody have such a strong view of guns that they won't be able to be fair in this case?

No jurors raised their hands. Although one juror asked whether the guns were legal and expressed the view that anyone with a gun should have to have a permit,

the court ultimately dismissed this juror for cause. The prosecutor also brought up the subject of the books the police uncovered:

> You may hear testimony about some of the books that were recovered from the defendant's house. They include how to make . . . disposable silencers, The Anarchist's Black Book of Improved Munitions, The Improvised Munitions Handbook. Things like that.
>
> Anybody can have whatever books they want, of course. I'm just trying to find out whether or not somebody having those kinds of books or hearing about titles like that is going to cause a visceral reaction in anybody, prevent somebody from being fair.

One juror gave an affirmative answer. This juror also was dismissed for cause and was not part of the empanelled jury.

¶ 19. The trial began later that day. The State presented the testimony of Oehler first. His testimony was similar to what he said at the warrant application hearing with a few variances. He stated that he had been to Stank's residence over one hundred times and spent roughly $70 on his weekly purchases. He also testified that he knew the identity of the anonymous informant. He claimed his cousin had made that phone call to get even with Stank for flirting with his wife at a party.

¶ 20. The State also called seven police witnesses involved with either the search, the handling or analysis of the seized evidence, or both, and the forensic scientist who analyzed the drug evidence. Detectives Glidewell and Davila testified to their visual identification of the Oxycontin, and Detective Davila also discussed the results of her chemical analysis of the marijuana. The forensic scientist from the state crime

laboratory testified about her examination of the drug evidence as well. With respect to the twenty green pills in Exhibit 47, she stated to a reasonable degree of scientific certainty that the pills were Oxycontin. She further stated that the assortment of pills in Exhibit 46—which Detective Glidewell recovered from the garbage can—were consistent in appearance with the Oxycontin pills in the *Physician's Desk Reference*. This witness confirmed that the green pills looked identical to those in Exhibit 47.

¶ 21. The State also presented testimony about the amount of drugs and the drugs' street value. The amount of marijuana totaled approximately three pounds or over one thousand grams. According to Detective Glidewell's testimony, a gram of marijuana could sell on the street for anywhere between $5 and $15 dollars. At the time of the search, the amount found in Stank's house would probably have sold for at least $6000 if sold by the gram. If sold wholesale by the pound, it would sell for roughly $2100. Detective Glidewell asserted that in his experience, people who buy marijuana for personal use usually buy by the gram or by the ounce, while dealers usually buy by the pound.

¶ 22. The jury also heard testimony about the value of the fifty-seven Oxycontin pills. According to Detective Glidewell, a white ten-milligram pill sells for $15 to $20, and a yellow forty-milligram pill sells for $20 to $30. The green eighty-milligram tablets can sell for as much as $40 per pill. Detective Glidewell also stated that, based on his experience, users of Oxycontin usually possess only one or two pills at a time.

¶ 23. During the State's case, the court admitted several exhibits, including the drug evidence and various drug paraphernalia, such as the marijuana pipes, the scale, and the grow lights. It also admitted many of

the firearms, the bulletproof vest, the flash suppressor, and the various munitions-related publications.

¶ 24. At the close of the State's case, the defense moved to dismiss each of the four counts for lack of sufficient evidence. Defense counsel also opposed the admission of Exhibit 46 because the forensic scientist could not state to a reasonable degree of scientific certainty that the pills in that exhibit contained Oxycontin. The court ruled in favor of the State.

¶ 25. The defense called Detectives Heck and Glidewell as defense witnesses. Both testified about their conversations with Oehler. Heck also confirmed that he had investigated Stank's burglary complaint and his arrest of Oehler for the unlawful telephone use. Stank also called a friend as well as his neighbor. The friend testified that he and Stank often hunted together and that he had seen some of Stank's hunting guns. He also asserted that he knew Stank to collect guns. The witness denied ever seeing drugs in Stank's house in the seven to ten years that he knew him. The neighbor testified last. He stated that in the fall of 2001, he heard the burglar alarm go off at Stank's house and thought he recognized the silhouette and vehicle of a person he now knows to be Oehler. Essentially the defense theory of the case was that Oehler may have planted the drug evidence in order to get even with Stank and that there was an innocent explanation for the presence of the guns, namely that Stank was an avid hunter who collected guns.

¶ 26. At the close of all the evidence, the defense renewed its motion to dismiss each of the four counts. The court again denied the motion, and the jury returned a verdict of guilty on all four counts. The court entered judgment on counts one, three, and four. After

some reflection, the court also entered judgment on count two, the possession with intent to deliver Oxycontin charge.

¶ 27. Stank sought postconviction relief on March 22, 2004. He renewed his objection that the physical evidence should have been suppressed and his contention that the evidence adduced at trial was insufficient to support count two of the amended information. He also stated that the court erred by admitting the guns and publications because they constituted improper character evidence. The court denied relief, and Stank appeals.

¶ 28. We first address Stank's contention that the fruits of the search should have been suppressed because the search warrant was defective. We give great deference to a court's determination of probable cause to issue a warrant, and the defendant bears the burden of challenging probable cause. *State v. Multaler*, 2002 WI 35, ¶ 7, 252 Wis. 2d 54, 643 N.W.2d 437. The court may draw reasonable inferences from the evidence presented and must make a practical, commonsense determination whether, based on that evidence and under all the circumstances, a fair probability exists that contraband or evidence of a crime will be found at the place to be searched. *Id.*, ¶ 8.

¶ 29. Stank claims two grounds for defectiveness here. First, he argues that the court should not have found probable cause existed because Oehler's testimony was inherently unreliable. When he argued that ground before the trial court, he pointed to the falling out between the parties, the fact that law enforcement had promised not to pursue the unlawful use of the telephone charges against Oehler, Oehler's criminal

record, and the fact that the police had reimbursed Oehler for transportation expenses so he could be present at the warrant application hearing. On appeal, he also points to perceived inconsistencies between Oehler's testimony at the hearing and his trial testimony—specifically, he points to the number of times Oehler had been to Stank's apartment, the amount of his weekly purchases, and Oehler's statement at trial identifying his cousin as the anonymous tipster—to bolster his position that had the trial court allowed him to have an evidentiary hearing, he could have cast doubt on Oehler's credibility and veracity prior to the trial.

¶ 30. We hold that Stank was not entitled to such a hearing. In *Morales v. State*, 44 Wis. 2d 96, 102–03, 170 N.W.2d 684 (1969), our supreme court held that a defendant could not challenge the credibility of the witness upon whose testimony the court relied in issuing the search warrant. There, the defendant pointed to his wife's testimony at trial that she had a romantic relationship with the witness prior to her marriage to the defendant. *Id.* at 102. The court deemed this fact irrelevant and held that where the witness testified to facts within his personal knowledge, the court could justifiably accept it as trustworthy. *Id.* at 102–03. In other words, it was for the warrant-issuing court to evaluate the credibility of the witness, and any challenge to the court's finding was limited to the record established before the court at the time it issued the warrant. *See also Rainey v. State*, 74 Wis. 2d 189, 199–200, 246 N.W.2d 529 (1976) (magistrate entitled to find a witness credible because he had the ability to observe the demeanor of witness and hear his testimony, even if the witness was a paid informant).

¶ 31. Like the defendant in *Morales*, Stank relies primarily on testimony adduced at the trial and evidence that the witness testifying in support of the search warrant had a personal vendetta against him and other incentives to lie on behalf of law enforcement. We note that in this case, the warrant-issuing court *did* hear about Oehler's motives to fabricate testimony and nonetheless found him to be truthful. Moreover, the mere desire for cross-examination does not justify an evidentiary hearing, *Franks v. Delaware*, 438 U.S. 154, 171 (1978), so the possibility that Stank could have elicited inconsistent testimony at an evidentiary hearing is irrelevant.

¶ 32. We note that *Franks* does entitle a defendant to an evidentiary hearing when he or she can make a preliminary showing that a witness deliberately lied or testified with disregard for the truth of his or her statements. *See also State v. Mann*, 123 Wis. 2d 375, 385–89, 367 N.W.2d 209 (1985) (extending *Franks* to material omissions of fact that are the equivalent of deliberate falsehoods or reckless disregard for the truth). Here, however, that case is inapposite. Defense counsel expressly agreed with the trial court's observation that he was not pursuing a *Franks-Mann* motion but rather merely sought to impeach Oehler's credibility.

¶ 33. Stank's second objection to the warrant is that Oehler's information was "stale" because Oehler had not been to Stank's residence for almost two months by the time he testified in support of the warrant. We disagree. Again, *Multaler* teaches that the passage of time does not alone render probable cause

431

stale and that in certain circumstances, old information may still support an inference that probable cause exists at the time the State applies for a warrant. *Multaler*, 252 Wis. 2d 54, ¶ 36. The warrant-issuing court may look to several factors in determining whether probable cause remains in the face of old information, including: the nature of the underlying circumstances, whether the activity is of a protracted or continuous nature, the nature of the criminal activity under investigation, and the nature of the evidence sought. *Id.*, ¶ 37. Moreover, the court may consider the experience and special knowledge of the police officers applying for a warrant among other relevant factors. *Id.*, ¶ 43.

¶ 34. The court here had ample basis to conclude that probable cause existed. It heard Oehler's testimony that he bought $50 worth of marijuana from Stank on a weekly basis, that he had been to Stank's residence over 500 times, that every time Oehler was at the residence, he would see the same group of other individuals there to buy drugs, and that Stank had showed him a firearm he owned. He also testified that Stank had been his supplier for several years and that Stank stored his drugs in two freezers in the house. This evidence supported the conclusion that Stank had a longstanding, ongoing, and large-scale drug-trafficking business. The court was also entitled to rely on Detective Glidewell's testimony that in his experience, such operations did not just suddenly cease. Moreover, the nature of the evidence sought—drugs and drug paraphernalia, cash and ledgers, and weapons that a dealer might use to protect his drugs—were directly related to that continuous and ongoing activity. In light of these factors, the roughly two-month passage of time did not

significantly diminish the probability that the officers would uncover evidence of drug dealing.

¶ 35. We next consider Stank's argument that the trial court plainly erred in admitting the weapons and the munitions-related publications. *See* WIS. STAT. § 901.03(4) (2003–04) (court may consider plain errors affecting substantial rights even where not brought to the attention of the trial court). A "plain error" means a clear or obvious error, one that likely deprived the defendant of a basic constitutional right. *State v. Frank*, 2002 WI App 31, ¶ 25, 250 Wis. 2d 95, 640 N.W.2d 198 (Ct. App. 2001). Relying on *State v. Spraggin*, 77 Wis. 2d 89, 252 N.W.2d 94 (1977), Stank claims admitting this evidence deprived him of his constitutional right to a fair trial, insisting that the State admitted the weapons and publications in order to sully his character. In *Spraggin*, the court held that evidence of the defendant's possession of guns and stolen goods was improperly admitted in her trial for intentionally aiding and abetting in the delivery of heroin. *Id.* at 92, 96–102. Stank quotes the following passage from *Spraggin*:

> Weapons and stolen goods may constitute the protection and currency necessary in the realm of heroin trafficking, but the State did not demonstrate in any manner that this particular evidence was so employed. The inference of such use must be supported by more than the mere introduction of these exhibits into evidence and the broad assertion that guns and stolen goods are commonly used by those in the heroin trade.

*Id.* at 100.

¶ 36. We disagree that *Spraggin* is on point. In *State v. Wedgeworth*, 100 Wis. 2d 514, 530–31, 302 N.W.2d 810 (1981), the supreme court expressly limited *Spraggin* to cases involving improper character evi-

dence. *See id.* (stating *Spraggin* should not be extended to cover circumstances beyond Wɪs. Sᴛᴀᴛ. § 904.04(2)). In *Wedgeworth,* the State's admission of such evidence was directly relevant not to an "other act" but to an element of the crime with which Wedgeworth was charged, possession with intent to deliver. The offenses charged in that case were possession of marijuana and possession with intent to deliver heroin. *Wedgeworth,* 100 Wis. 2d at 516, 533. A police witness identified at trial three weapons seized from the defendant's home. *Id.* at 527. He further testified that on previous occasions he had encountered guns and gunfire when executing search warrants in narcotics cases. *Id.* The court held the evidence was properly admitted as "indicative of the role of self-help and self-protection in the business of drug trafficking." *Id.* at 533. This inference differed from the inference invited by the evidence in *Spraggin* that because heroin dealers often engaged in self-help, the defendant's possession of guns made it more likely that she was engaged in drug schemes and therefore was guilty of aiding and abetting heroin dealing. *See Spraggin,* 77 Wis. 2d at 99.

¶ 37. Stank's case more closely resembles *Wedgeworth.* Contrary to Stank's assertions, the weapons and publication evidence went directly to the "while armed" element of the offense and were relevant for purposes other than demonizing Stank's character. Indeed, they were highly probative wholly independent of any negative character inference. The presence of the guns, when juxtaposed with the publications, the flash suppresser, and the bulletproof vest struck at the core of the defense theory of the case. The jury heard evidence that hunters do not use flash suppressors and bulletproof vests. Moreover, it heard evidence that the Mac-11 to which the flash suppressor attached was not

a hunting gun. This evidence suggested Stank intended to use the guns not, as he claimed, for innocent purposes like hunting but for violent purposes, an inference bolstered by the introduction of the publications.

¶ 38. The location of the guns further magnified the evidentiary value of this evidence. Detective Glidewell found the pistol, for example, in a garbage can containing not trash but a bottle of Oxycontin pills and bags of marijuana. Stank's deliberate placement of the pistol next to the drugs strongly suggests he placed it there to guard them. Similarly, the bulletproof vest, the Mac-11 handgun, and two other weapons were found in the same closet as two marijuana pipes, the other stash of Oxycontin, and the yellow envelope containing $700 in cash.

¶ 39. Given the potent nature of the weapons and publication evidence wholly apart from any impermissible character inferences, we cannot say that the trial court clearly erred in allowing this evidence. Moreover, the possibility that the jury would use this evidence for an impermissible purpose was strongly diminished. At voir dire, the State warned the prospective jurors that it intended to introduce such evidence and indicated that they should not decide the case based on visceral reactions to such items. Indeed, the two jurors who expressed strong feelings with respect to these items were dismissed for cause. Again, to the extent the court erred, any error is far from obvious.

¶ 40. Finally, we reach Stank's objection to the sufficiency of the evidence with respect to count two, possession with intent to deliver Oxycontin, while armed. First, he protests that the State only had one of the two stashes of suspected Oxycontin tested and therefore could not even prove that all of the drugs *were*

in fact Oxycontin. According to Stank, the forensic scientist's comparison of the pills to the desk reference did not suffice to identify the pills as Oxycontin because she "would not express an opinion to a reasonable degree of scientific certainty that the pills in Exhibit 46 contained oxycodone."

¶ 41. We reject Stank's argument based on *State v. Dye*, 215 Wis. 2d 281, 572 N.W.2d 524 (Ct. App. 1997). The defendant in that case objected that the State had failed to meet its burden of proving the amount of cocaine in his possession. *Id.* at 288–89. The chemist had conducted presumptive color tests on all fifteen samples of suspected cocaine and concluded that one contained cocaine powder and the others cocaine base. *Id.* at 285. He performed confirmatory tests on the cocaine base sample and on one of the fourteen samples of cocaine powder, both of which tested positive for cocaine. *Id.* at 285–86. At trial the chemist testified that the presumptive test he used was ninety-nine percent accurate and that his practice of randomly testing a representative sample was widely employed. *Id.* at 290–91. We held that the State had put forth sufficient evidence to support the conviction based on the combination of the presumptive test, the confirmatory follow-up tests, and other circumstantial evidence obtained during the search. *Id.* at 292.

¶ 42. Here, the forensic scientist conducted both a presumptive identification and a confirmatory test on a random sample of the suspected Oxycontin. Identification of a pill using the *Physician's Desk Reference* qualifies as a presumptive test. Wisconsin Stat. § 907.02 and *State v. Hollingsworth*, 160 Wis. 2d 883, 895–96, 467 N.W.2d 555 (Ct. App. 1991), recognize that any specialized knowledge beyond the ken of the average

436

person, including knowledge gained from experience alone, can form the predicate of an expert opinion. Thus, the knowledge need not be "scientific," *see Hollingsworth*, 160 Wis. 2d at 896 (no special technical or academic training necessary), and "scientific certainty" is not necessary. The fact that the witness here was a forensic scientist therefore did not preclude her from forming an expert opinion about the accuracy of the desk reference based on *experience*. This witness testified that in her eleven years of experience, she had never found her pharmaceutical identification of a tablet inconsistent with the results of scientific tests. Detective Davila gave similar testimony based on her experience on the vice control squad, stating that she had never seen a case in which the pill she identified in the desk reference turned out to be a counterfeit of that drug.

¶ 43. Moreover, we note that other courts have recognized the *Physician's Desk Reference* as a source commonly relied upon by members of the medical profession and pharmaceutical industry. A New York court characterized the desk reference as a "compendium often relied upon by physicians to obtain knowledge of the proper uses and hazards of drugs," *see Tenuto v. Lederle Labs., Div. Of Am. Cyanamid Co.*, 695 N.Y.S.2d 259, 266 (Sup. Ct. 1999) (citation omitted), and among the "well-known methods by which pharmaceutical manufacturers apprise the medical profession of the dangers of a drug." *Id.* (citation omitted). Even more significantly, at least one federal court has relied on the desk reference for its pictorial representations of different drugs. In *American Home Products Corp. v. Chelsea Laboratories, Inc.*, 572 F. Supp. 278, 278–81 (D.N.J. 1982), *aff'd*, 722 F.2d 730 (3d Cir. 1983), 722 F.2d 731 (3d Cir. 1983), and 722 F.2d 736 (3d Cir. 1983), the plaintiff,

a drug manufacturer, sued another drug company for marketing pills using the same trade dress. The court compared features comprising a drug's trade dress, *e.g.*, color, shape, size, and finish, with features on a human face, observing that enough combinations of features existed for each drug to have a different trade dress. *Id.* at 281. It pointed to the desk reference as evidence that drug manufacturers customarily design unique trade dresses for each product. *Id.* Significantly, the forensic expert and Detective Davila cited various aspects of trade dress, including color, shape, size, absence of scoring, and finish, as the features they identified from the desk reference.

¶ 44. In addition to the presumptive pharmaceutical evaluation by Detective Davila and the forensic scientist, the jury in this case, just as the fact finder in *Dye*, had a confirmatory follow-up test and other circumstantial evidence of content that it could consider. The forensic scientist performed two confirmatory scientific tests on one of the green pills in Exhibit 47. This pill was identical in appearance to all of the other pills in Exhibit 47 and to six of the pills in Exhibit 46. Thus, it was a representative sample of some pills in both exhibits. Although the yellow and white pills were not tested, other circumstantial evidence of their content corroborates the presumptive identification. First, they were placed in the same container as green pills identified as Oxycontin through the representative sampling. Second, they were found next to other suspected drugs that subsequently tested positive as marijuana. All of these factors together constitute sufficient evidence that the pills contained Oxycontin.

¶ 45. We further reject Stank's argument that insufficient evidence existed to support the "intent to

deliver" element of count two. According to *Peasley v. State*, 83 Wis. 2d 224, 229, 231–32, 265 N.W.2d 506 (1978), the finder of fact may consider many factors indicative of intent to deliver, including the amount of the controlled substance, its dollar value, and the presence of other drugs and drug paraphernalia. Numerous of these factors supported the verdict in this case. First, Detective Glidewell's unimpeached testimony was that typically a user of Oxycontin purchases one or two pills at a time. Stank had ten times that amount in his closet and an even greater quantity in the trash can. Moreover, the street values are consistent with drug trafficking. The pills in Exhibit 47 had a potential sale value of $800. The detective gave a range of values for the ten- and forty-milligram tablets. Assuming Stank sold at the low end of this range, the sale value for all of the pills in Exhibit 46 totals $850. At the high end, the amount comes closer to $1150. The value of his entire stash of pills then is somewhere between $1650 and $1950. We also note the yellow envelope with $700 in cash which lay in close proximity to the pills in Exhibit 47.

¶ 46. The jury was also entitled to look at the presence of the approximately three pounds of marijuana, an amount far more consistent with the large-scale dealing of drugs than with personal use. Further, depending on whether it sold by the pound or by the gram, the marijuana supplies could sell at *minimum* for anywhere between $2100 and $6000. The presence of drug paraphernalia, Oehler's testimony that he frequently saw other people buying marijuana from Stank, and weapons available to protect the supplies also support an inference that Stank engaged in drug trafficking and therefore intended to sell the Oxycontin.

¶ 47. We affirm on all grounds. Stank was not entitled to an evidentiary hearing to attack Oehler's credibility, and Oehler's absence from Stank's residence was insignificant in terms of probable cause given the longstanding and large-scale nature of Stank's drug activity. The court also did not plainly err at trial because the reading material, firearms, and other weapons-related accessories had highly probative value wholly unrelated to vilifying Stank's character. Finally, the evidence supports the Oxycontin charge. Detective Davila and the forensic scientist properly used the *Physician's Desk Reference* to presumptively determine the identity of the suspected Oxycontin. The result of this presumptive test, as in *Dye*, was supported both by a confirmatory test and other circumstantial evidence. Finally, the record contains plenty of circumstantial evidence that Stank intended to deliver the Oxycontin.

*By the Court.*—Judgments and order affirmed.